(Slip Opinion)        OCTOBER TERM, 2005        1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## RUMSFELD, SECRETARY OF DEFENSE, ET AL. *v.* FORUM FOR ACADEMIC AND INSTITUTIONAL RIGHTS, INC., ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 04–1152.   Argued December 6, 2005—Decided March 6, 2006

Respondent Forum for Academic and Institutional Rights, Inc. (FAIR), is an association of law schools and law faculties, whose members have policies opposing discrimination based on, *inter alia,* sexual orientation.   They would like to restrict military recruiting on their campuses because they object to the Government's policy on homosexuals in the military, but the Solomon Amendment—which provides that educational institutions denying military recruiters access equal to that provided other recruiters will lose certain federal funds—forces them to choose between enforcing their nondiscrimination policy against military recruiters and continuing to receive those funds.   In 2003, FAIR sought a preliminary injunction against enforcement of an earlier version of the Solomon Amendment, arguing that forced inclusion and equal treatment of military recruiters violated its members' First Amendment freedoms of speech and association.   Denying relief on the ground that FAIR had not established a likelihood of success on the merits, the District Court concluded that recruiting is conduct, not speech, and thus Congress could regulate any expressive aspect of the military's conduct under *United States* v. *O'Brien,* 391 U. S. 367.   The District Court, however, questioned the Department of Defense (DOD) interpretation of the Solomon Amendment, under which law schools must provide recruiters access at least equal to that provided other recruiters.   Congress responded to this concern by codifying the DOD's policy.   Reversing the District Court's judgment, the Third Circuit concluded that the amended Solomon Amendment violates the unconstitutional conditions doctrine by forcing a law school to choose between surrendering First

Syllabus

Amendment rights and losing federal funding for its university. The court did not think that *O'Brien* applied, but nonetheless determined that, if the activities were expressive conduct rather than speech, the Solomon Amendment was also unconstitutional under that decision.

*Held:* Because Congress could require law schools to provide equal access to military recruiters without violating the schools' freedoms of speech and association, the Third Circuit erred in holding that the Solomon Amendment likely violates the First Amendment. Pp. 5–21.

1. The Solomon Amendment should be read the way both the Government and FAIR interpret it: In order for a law school and its university to receive federal funding, the law school must offer military recruiters the same access to its campus and students that it provides to the nonmilitary recruiter receiving the most favorable access. Contrary to the argument of *amici* law professors, a school excluding military recruiters could not comply with the Solomon Amendment by also excluding any other recruiter that violates its nondiscrimination policy. The Secretary of Defense must compare the military's "access to campuses" and "to students" to "the access to campuses and to students that is provided to any other employer." 10 U. S. C. A. §983. The statute does not focus on the content of a school's recruiting policy, but on the result achieved by the policy. Applying the same policy to all recruiters does not comply with the statute if it results in a greater level of access for other recruiters than for the military. This interpretation is supported by the text of the statute and is necessary to give effect to the Solomon Amendment's recent revision. Pp. 5–8.

2. Under the Solomon Amendment, a university must allow equal access for military recruiters in order to receive certain federal funds. Although there are limits on Congress' ability to condition the receipt of funds, see, *e.g., United States* v. *American Library Assn., Inc.,* 539 U. S. 194, 210, a funding condition cannot be unconstitutional if it could be constitutionally imposed directly. Because the First Amendment would not prevent Congress from directly imposing the Solomon Amendment's access requirement, the statute does not place an unconstitutional condition on the receipt of federal funds. Pp. 8–20.

(a) As a general matter, the Solomon Amendment regulates conduct, not speech. Nevertheless, the Court of Appeals concluded that the statute violates law schools' freedom of speech in a number of ways. First, the law schools must provide military recruiters with some assistance clearly involving speech, such as sending e-mails and distributing flyers, if they provide such services to other recruiters. This speech is subject to First Amendment scrutiny, but the compelled speech here is plainly incidental to the statute's regulation of

conduct. Compelling a law school that sends e-mails for other recruiters to send one for a military recruiter is simply not the same as forcing a student to pledge allegiance to the flag, *West Virginia Bd. of Ed.* v. *Barnette,* 319 U. S. 624, or forcing a Jehovah's Witness to display a particular motto on his license plate, *Wooley* v. *Maynard,* 430 U. S. 705, and it trivializes the freedom protected in *Barnette* and *Wooley* to suggest that it is.

Second, that military recruiters are, to some extent, speaking while on campus does not mean that the Solomon Amendment unconstitutionally requires laws schools to accommodate the military's message by including those recruiters in interviews and recruiting receptions. This Court has found compelled-speech violations where the complaining speaker's own message was affected by the speech it was forced to accommodate. See, *e.g., Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.,* 515 U. S. 557, 566. Here, however, the schools are not speaking when they host interviews and recruiting receptions. They facilitate recruiting to assist their students in obtaining jobs. Thus, a law school's recruiting services lack the expressive quality of, for example*,* the parade in *Hurley*. Nothing about recruiting suggests that law schools agree with any speech by recruiters, and nothing in the Solomon Amendment restricts what they may say about the military's policies.

Third, freedom of speech can be violated by expressive conduct, but the expressive nature of the conduct regulated by the Solomon Amendment does not bring that conduct within the First Amendment's protection. Unlike flag burning, see *Texas* v. *Johnson,* 491 U. S. 397, the conduct here is not so inherently expressive that it warrants protection under *O'Brien*. Before adoption of the Solomon Amendment's equal-access requirement, law schools expressed their disagreement with the military by treating military recruiters differently from other recruiters. These actions were expressive not because of the conduct but because of the speech that accompanied that conduct. Moreover, even if the Solomon Amendment were regarded as regulating expressive conduct, it would be constitutional under *O'Brien*. Pp. 8–18.

(b) The Solomon Amendment also does not violate the law schools' freedom of expressive association. Unlike *Boy Scouts of America* v. *Dale,* 530 U. S. 640, where the Boy Scouts' freedom of expressive association was violated when a state law required the organization to accept a homosexual scoutmaster, the statute here does not force a law school "'to accept members it does not desire,'" *id.,* at 648. Law schools "associate" with military recruiters in the sense that they interact with them, but recruiters are not part of the school. They are outsiders who come onto campus for the limited purpose of

Syllabus

trying to hire students—not to become members of the school's expressive association. The freedom of expressive association protects more than a group's membership decisions, reaching activities that affect a group's ability to express its message by making group membership less attractive. But the Solomon Amendment has no similar effect on a law school's associational rights. Students and faculty are free to associate to voice their disapproval of the military's message; nothing about the statute affects the composition of the group by making membership less desirable. Pp. 18–20.

390 F. 3d 219, reversed and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which all other Members joined, except ALITO, J., who took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 04–1152

DONALD H. RUMSFELD, SECRETARY OF DEFENSE, ET AL., PETITIONERS *v.* FORUM FOR ACADEMIC AND INSTITUTIONAL RIGHTS, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

[March 6, 2006]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

When law schools began restricting the access of military recruiters to their students because of disagreement with the Government's policy on homosexuals in the military, Congress responded by enacting the Solomon Amendment. See 10 U. S. C. A. §983 (Supp. 2005). That provision specifies that if any part of an institution of higher education denies military recruiters access equal to that provided other recruiters, the entire institution would lose certain federal funds. The law schools responded by suing, alleging that the Solomon Amendment infringed their First Amendment freedoms of speech and association. The District Court disagreed but was reversed by a divided panel of the Court of Appeals for the Third Circuit, which ordered the District Court to enter a preliminary injunction against enforcement of the Solomon Amendment. We granted certiorari.

I

Respondent Forum for Academic and Institutional

Rights, Inc. (FAIR), is an association of law schools and law faculties. App. 5. Its declared mission is "to promote academic freedom, support educational institutions in opposing discrimination and vindicate the rights of institutions of higher education." *Id.*, at 6. FAIR members have adopted policies expressing their opposition to discrimination based on, among other factors, sexual orientation. *Id.*, at 18. They would like to restrict military recruiting on their campuses because they object to the policy Congress has adopted with respect to homosexuals in the military. See 10 U. S. C. §654.[1] The Solomon Amendment, however, forces institutions to choose between enforcing their nondiscrimination policy against military recruiters in this way and continuing to receive specified federal funding.

In 2003, FAIR sought a preliminary injunction against enforcement of the Solomon Amendment, which at that time—it has since been amended—prevented the Department of Defense (DOD) from providing specified federal funds to any institution of higher education "that either prohibits, or in effect prevents" military recruiters "from gaining entry to campuses." §983(b).[2] FAIR considered

---

[1] Under this policy, a person generally may not serve in the Armed Forces if he has engaged in homosexual acts, stated that he is a homosexual, or married a person of the same sex. Respondents do not challenge that policy in this litigation.

[2] The complaint named numerous other plaintiffs as well. The District Court concluded that each plaintiff had standing to bring this suit. 291 F. Supp. 2d 269, 284–296 (NJ 2003). The Court of Appeals for the Third Circuit agreed with the District Court that FAIR had associational standing to bring this suit on behalf of its members. 390 F. 3d 219, 228, n. 7 (2004). The Court of Appeals did not determine whether the other plaintiffs have standing because the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement. *Ibid.* (citing *Bowsher* v. *Synar,* 478 U. S. 714, 721 (1986)). Because we also agree that FAIR has standing, we similarly limit our discussion to FAIR.

the DOD's interpretation of this provision particularly objectionable. Although the statute required only "entry to campuses," the Government—after the terrorist attacks on September 11, 2001—adopted an informal policy of "'requir[ing] universities to provide military recruiters access to students equal in quality and scope to that provided to other recruiters.'" 291 F. Supp. 2d 269, 283 (NJ 2003). Prior to the adoption of this policy, some law schools sought to promote their nondiscrimination policies while still complying with the Solomon Amendment by having military recruiters interview on the undergraduate campus. *Id.*, at 282. But under the equal access policy, military recruiters had to be permitted to interview at the law schools, if other recruiters did so.

FAIR argued that this forced inclusion and equal treatment of military recruiters violated the law schools' First Amendment freedoms of speech and association. According to FAIR, the Solomon Amendment was unconstitutional because it forced law schools to choose between exercising their First Amendment right to decide whether to disseminate or accommodate a military recruiter's message, and ensuring the availability of federal funding for their universities.

The District Court denied the preliminary injunction on the ground that FAIR had failed to establish a likelihood of success on the merits of its First Amendment claims. The District Court held that inclusion "of an unwanted periodic visitor" did not "significantly affect the law schools' ability to express their particular message or viewpoint." *Id.*, at 304. The District Court based its decision in large part on the determination that recruiting is conduct and not speech, concluding that any expressive aspect of recruiting "is entirely ancillary to its dominant economic purpose." *Id.*, at 308. The District Court held that Congress could regulate this expressive aspect of the conduct under the test set forth in *United States* v. *O'Brien,*

4       RUMSFELD *v.* FORUM FOR ACADEMIC AND INSTITU-
TIONAL RIGHTS, INC.

Opinion of the Court

391 U. S. 367 (1968).  291 F. Supp. 2d, at 311–314.

In rejecting FAIR's constitutional claims, the District Court disagreed with "the DOD's proposed interpretation that the statute requires law schools to 'provide military recruiters access to students that is at least equal in quality and scope to the access provided other potential employers.'" *Id.,* at 321.  In response to the District Court's concerns, Congress codified the DOD's informal policy. See H. R. Rep. No. 108–443, pt. 1, p. 6 (2004) (discussing the District Court's decision in this case and stating that the amended statute "would address the court's opinion and codify the equal access standard").  The Solomon Amendment now prevents an institution from receiving certain federal funding if it prohibits military recruiters "from gaining access to campuses, or access to students . . . on campuses, for purposes of military recruiting in a manner that is at least equal in quality and scope to the access to campuses and to students that is provided to any other employer."  10 U. S. C. A. §983(b) (Supp. 2005).[3]

FAIR appealed the District Court's judgment, arguing that the recently amended Solomon Amendment was unconstitutional for the same reasons as the earlier version.  A divided panel of the Court of Appeals for the Third Circuit agreed.  390 F. 3d 219 (2004).  According to the Third Circuit, the Solomon Amendment violated the unconstitutional conditions doctrine because it forced a law school to choose between surrendering First Amendment rights and losing federal funding for its university.  *Id.,* at

———————

[3] The federal funds covered by the Solomon Amendment are specified at 10 U. S. C. A. §983(d)(1) (Supp. 2005) and include funding from the Departments of Defense, Homeland Security, Transportation, Labor, Health and Human Services, and Education, and the Central Intelligence Agency and the National Nuclear Security Administration of the Department of Energy.  Funds provided for student financial assistance are not covered.  §983(d)(2).  The loss of funding applies not only to the particular school denying access but universitywide.  §983(b).

229–243.  Unlike the District Court, the Court of Appeals did not think that the *O'Brien* analysis applied because the Solomon Amendment, in its view, regulated speech and not simply expressive conduct.  390 F. 3d, at 243–244. The Third Circuit nonetheless determined that if the regulated activities were properly treated as expressive conduct rather than speech, the Solomon Amendment was also unconstitutional under *O'Brien*.  390 F. 3d, at 244– 246.  As a result, the Court of Appeals reversed and re- manded for the District Court to enter a preliminary injunction against enforcement of the Solomon Amend- ment.  *Id.,* at 246.  A dissenting judge would have applied *O'Brien* and affirmed.  390 F. 3d, at 260–262.

We granted certiorari.  544 U. S. 1017 (2005).

## II

The Solomon Amendment denies federal funding to an institution of higher education that "has a policy or prac- tice . . . that either prohibits, or in effect prevents" the military "from gaining access to campuses, or access to students . . . on campuses, for purposes of military recruit- ing in a manner that is at least equal in quality and scope to the access to campuses and to students that is provided to any other employer."   10 U. S. C. A. §983(b) (Supp. 2005).  The statute provides an exception for an institution with "a longstanding policy of pacifism based on historical religious affiliation."   §983(c)(2).   The Government and FAIR agree on what this statute requires: In order for a law school and its university to receive federal funding, the law school must offer military recruiters the same access to its campus and students that it provides to the nonmilitary recruiter receiving the most favorable access.

Certain law professors participating as *amici,* however, argue that the Government and FAIR misinterpret the statute.  See Brief for William Alford et al. as *Amici Cu- riae* 10–18; Brief for 56 Columbia Law School Faculty

6        RUMSFELD *v.* FORUM FOR ACADEMIC AND INSTITU-
                TIONAL RIGHTS, INC.

                  Opinion of the Court

Members as *Amici Curiae* 6–15.  According to these *amici*,
the Solomon Amendment's equal-access requirement is
satisfied when an institution applies to military recruiters
the same policy it applies to all other recruiters.  On this
reading, a school excluding military recruiters would
comply with the Solomon Amendment so long as it also
excluded any other employer that violates its nondiscrimi-
nation policy.

In its reply brief, the Government claims that this ques-
tion is not before the Court because it was neither in-
cluded in the questions presented nor raised by FAIR.
Reply Brief for United States 20, n. 4.  But our review
may, in our discretion, encompass questions "'fairly in-
cluded'" within the question presented, *Yee* v. *Escondido,*
503 U. S. 519, 535 (1992), and there can be little doubt that
granting certiorari to determine whether a statute is
constitutional fairly includes the question of what that
statute says.  Nor must we accept an interpretation of a
statute simply because it is agreed to by the parties.  After
all, "[o]ur task is to construe what Congress has enacted."
*Duncan* v. *Walker,* 533 U. S. 167, 172 (2001).  We think it
appropriate in the present case to consider whether institu-
tions can comply with the Solomon Amendment by apply-
ing a general nondiscrimination policy to exclude military
recruiters.

We conclude that they cannot and that the Government
and FAIR correctly interpret the Solomon Amendment.
The statute requires the Secretary of Defense to compare
the military's "access to campuses" and "access to stu-
dents" to "the access to campuses and to students that is
provided to *any other employer*."  (Emphasis added.)  The
statute does not call for an inquiry into why or how the
"other employer" secured its access.  Under *amici*'s read-
ing, a military recruiter has the same "access" to campuses
and students as, say, a law firm when the law firm is
permitted on campus to interview students and the mili-

tary is not. We do not think that the military recruiter has received equal "access" in this situation—regardless of whether the disparate treatment is attributable to the military's failure to comply with the school's nondiscrimination policy.

The Solomon Amendment does not focus on the *content* of a school's recruiting policy, as the *amici* would have it. Instead, it looks to the *result* achieved by the policy and compares the "access . . . provided" military recruiters to that provided other recruiters. Applying the same policy to all recruiters is therefore insufficient to comply with the statute if it results in a greater level of access for other recruiters than for the military. Law schools must ensure that their recruiting policy operates in such a way that military recruiters are given access to students at least equal to that "*provided* to any other employer." (Emphasis added.)

Not only does the text support this view, but this interpretation is necessary to give effect to the Solomon Amendment's recent revision. Under the prior version, the statute required "entry" without specifying how military recruiters should be treated once on campus. 10 U. S. C. §983(b). The District Court thought that the DOD policy, which required equal access to students once recruiters were on campus, was unwarranted based on the text of the statute. 291 F. Supp. 2d, at 321. Congress responded directly to this decision by codifying the DOD policy. Under *amici*'s interpretation, this legislative change had no effect—law schools could still restrict military access, so long as they do so under a generally applicable nondiscrimination policy. Worse yet, the legislative change made it *easier* for schools to keep military recruiters out altogether: under the prior version, simple access could not be denied, but under the amended version, access could be denied altogether, so long as a nonmilitary recruiter would also be denied access. That is rather

clearly *not* what Congress had in mind in codifying the DOD policy. We refuse to interpret the Solomon Amendment in a way that negates its recent revision, and indeed would render it a largely meaningless exercise.

We therefore read the Solomon Amendment the way both the Government and FAIR interpret it. It is insufficient for a law school to treat the military as it treats all other employers who violate its nondiscrimination policy. Under the statute, military recruiters must be given the same access as recruiters who comply with the policy.

## III

The Constitution grants Congress the power to "provide for the common Defence," "[t]o raise and support Armies," and "[t]o provide and maintain a Navy." Art. I, §8, cls. 1, 12–13. Congress' power in this area "is broad and sweeping," *O'Brien,* 391 U. S., at 377, and there is no dispute in this case that it includes the authority to require campus access for military recruiters. That is, of course, unless Congress exceeds constitutional limitations on its power in enacting such legislation. See *Rostker* v. *Goldberg,* 453 U. S. 57, 67 (1981). But the fact that legislation that raises armies is subject to First Amendment constraints does not mean that we ignore the purpose of this legislation when determining its constitutionality; as we recognized in *Rostker,* "judicial deference . . . is at its apogee" when Congress legislates under its authority to raise and support armies. *Id.,* at 70.

Although Congress has broad authority to legislate on matters of military recruiting, it nonetheless chose to secure campus access for military recruiters indirectly, through its Spending Clause power. The Solomon Amendment gives universities a choice: Either allow military recruiters the same access to students afforded any other recruiter or forgo certain federal funds. Congress' decision to proceed indirectly does not reduce the deference given

to Congress in the area of military affairs. Congress' choice to promote its goal by creating a funding condition deserves at least as deferential treatment as if Congress had imposed a mandate on universities.

Congress' power to regulate military recruiting under the Solomon Amendment is arguably greater because universities are free to decline the federal funds. In *Grove City College* v. *Bell,* 465 U. S. 555, 575–576 (1984), we rejected a private college's claim that conditioning federal funds on its compliance with Title IX of the Education Amendments of 1972 violated the First Amendment. We thought this argument "warrant[ed] only brief consideration" because "Congress is free to attach reasonable and unambiguous conditions to federal financial assistance that educational institutions are not obligated to accept." *Id.,* at 575. We concluded that no First Amendment violation had occurred—without reviewing the substance of the First Amendment claims—because Grove City could decline the Government's funds. *Id.*, at 575–576.

Other decisions, however, recognize a limit on Congress' ability to place conditions on the receipt of funds. We recently held that "'the government may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit.'" *United States* v. *American Library Assn., Inc.,* 539 U. S. 194, 210 (2003) (quoting *Board of Comm'rs, Wabaunsee Cty.* v. *Umbehr,* 518 U. S. 668, 674 (1996) (some internal quotation marks omitted)). Under this principle, known as the unconstitutional conditions doctrine, the Solomon Amendment would be unconstitutional if Congress could not directly require universities to provide military recruiters equal access to their students.

This case does not require us to determine when a condition placed on university funding goes beyond the "reasonable" choice offered in *Grove City* and becomes an unconstitutional condition. It is clear that a funding

10    RUMSFELD *v.* FORUM FOR ACADEMIC AND INSTITU-
TIONAL RIGHTS, INC.

Opinion of the Court

condition cannot be unconstitutional if it could be constitutionally imposed directly.  See *Speiser* v. *Randall,* 357 U. S. 513, 526 (1958).  Because the First Amendment would not prevent Congress from directly imposing the Solomon Amendment's access requirement, the statute does not place an unconstitutional condition on the receipt of federal funds.

A

The Solomon Amendment neither limits what law schools may say nor requires them to say anything.  Law schools remain free under the statute to express whatever views they may have on the military's congressionally mandated employment policy, all the while retaining eligibility for federal funds.  See Tr. of Oral Arg. 25 (Solicitor General acknowledging that law schools "could put signs on the bulletin board next to the door, they could engage in speech, they could help organize student protests").  As a general matter, the Solomon Amendment regulates conduct, not speech.  It affects what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*.

Nevertheless, the Third Circuit concluded that the Solomon Amendment violates law schools' freedom of speech in a number of ways.  First, in assisting military recruiters, law schools provide some services, such as sending e-mails and distributing flyers, that clearly involve speech.  The Court of Appeals held that in supplying these services law schools are unconstitutionally compelled to speak the Government's message.  Second, military recruiters are, to some extent, speaking while they are on campus.  The Court of Appeals held that, by forcing law schools to permit the military on campus to express its message, the Solomon Amendment unconstitutionally requires law schools to host or accommodate the military's speech.  Third, although the Court of Appeals thought that

the Solomon Amendment regulated speech, it held in the alternative that, if the statute regulates conduct, this conduct is expressive and regulating it unconstitutionally infringes law schools' right to engage in expressive conduct. We consider each issue in turn.[4]

1

Some of this Court's leading First Amendment precedents have established the principle that freedom of speech prohibits the government from telling people what they must say. In *West Virginia Bd. of Ed.* v. *Barnette,* 319 U. S. 624, 642 (1943), we held unconstitutional a state law requiring schoolchildren to recite the Pledge of Allegiance and to salute the flag. And in *Wooley* v. *Maynard,* 430 U. S. 705, 717 (1977), we held unconstitutional another that required New Hampshire motorists to display the state motto—"Live Free or Die"—on their license plates.

The Solomon Amendment does not require any similar expression by law schools. Nonetheless, recruiting assistance provided by the schools often includes elements of speech. For example, schools may send e-mails or post notices on bulletin boards on an employer's behalf. See,

———————

[4] The Court of Appeals also held that the Solomon Amendment violated the First Amendment because it compelled law schools to subsidize the Government's speech "by putting demands on the law schools' employees and resources." 390 F. 3d, at 240. We do not consider the law schools' assistance to raise the issue of subsidizing Government speech as that concept has been used in our cases. See *Johanns* v. *Livestock Marketing Assn.,* 544 U. S. 550, 559 (2005). The accommodations the law schools must provide to military recruiters are minimal, are not of a monetary nature, and are extended to all employers recruiting on campus, not just the Government. And in *Johanns*, which was decided after the Third Circuit's decision in this case, we noted that our previous compelled-subsidy cases involved subsidizing private speech, and we held that "[c]itizens may challenge compelled support of private speech, but have no First Amendment right not to fund government speech." *Id.,* at 562. The military recruiters' speech is clearly Government speech.

12    RUMSFELD *v.* FORUM FOR ACADEMIC AND INSTITU-
TIONAL RIGHTS, INC.

Opinion of the Court

*e.g.,* App. 169–170; Brief for NALP (National Association for Law Placement) et al. as *Amici Curiae* 11.  Law schools offering such services to other recruiters must also send e-mails and post notices on behalf of the military to comply with the Solomon Amendment.  As FAIR points out, these compelled statements of fact ("The U. S. Army recruiter will meet interested students in Room 123 at 11 a.m."), like compelled statements of opinion, are subject to First Amendment scrutiny.  See Brief for Respondents 25 (citing *Riley* v. *National Federation of Blind of N. C., Inc.,* 487 U. S. 781, 797–798 (1988)).

This sort of recruiting assistance, however, is a far cry from the compelled speech in *Barnette* and *Wooley*.  The Solomon Amendment, unlike the laws at issue in those cases, does not dictate the content of the speech at all, which is only "compelled" if, and to the extent, the school provides such speech for other recruiters.  There is nothing in this case approaching a Government-mandated pledge or motto that the school must endorse.

The compelled speech to which the law schools point is plainly incidental to the Solomon Amendment's regulation of conduct, and "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."  *Giboney* v. *Empire Storage & Ice Co.,* 336 U. S. 490, 502 (1949).  Congress, for example, can prohibit employers from discriminating in hiring on the basis of race.  The fact that this will require an employer to take down a sign reading "White Applicants Only" hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct.  See *R. A. V.* v. *St. Paul,* 505 U. S. 377, 389 (1992) ("[W]ords can in some circumstances violate laws directed not against speech but against conduct").  Compelling a law school that sends scheduling e-mails for other recruiters to send one for a

military recruiter is simply not the same as forcing a student to pledge allegiance, or forcing a Jehovah's Witness to display the motto "Live Free or Die," and it trivializes the freedom protected in *Barnette* and *Wooley* to suggest that it is.

2

Our compelled-speech cases are not limited to the situation in which an individual must personally speak the government's message. We have also in a number of instances limited the government's ability to force one speaker to host or accommodate another speaker's message. See *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.,* 515 U. S. 557, 566 (1995) (state law cannot require a parade to include a group whose message the parade's organizer does not wish to send); *Pacific Gas & Elec. Co.* v. *Public Util. Comm'n of Cal.,* 475 U. S. 1, 20–21 (1986) (plurality opinion); accord, *id.,* at 25 (Marshall, J., concurring in judgment) (state agency cannot require a utility company to include a third-party newsletter in its billing envelope); *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241, 258 (1974) (right-of-reply statute violates editors' right to determine the content of their newspapers). Relying on these precedents, the Third Circuit concluded that the Solomon Amendment unconstitutionally compels law schools to accommodate the military's message "[b]y requiring schools to include military recruiters in the interviews and recruiting receptions the schools arrange." 390 F. 3d, at 240.

The compelled-speech violation in each of our prior cases, however, resulted from the fact that the complaining speaker's own message was affected by the speech it was forced to accommodate. The expressive nature of a parade was central to our holding in *Hurley.* 515 U. S., at 568 ("Parades are . . . a form of expression, not just motion, and the inherent expressiveness of marching to make

14    RUMSFELD *v.* FORUM FOR ACADEMIC AND INSTITU-
TIONAL RIGHTS, INC.

Opinion of the Court

a point explains our cases involving protest marches"). We concluded that because "every participating unit affects the message conveyed by the [parade's] private organizers," a law dictating that a particular group must be included in the parade "alter[s] the expressive content of th[e] parade." *Id*., at 572–573. As a result, we held that the State's public accommodation law, as applied to a private parade, "violates the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Id.,* at 573.

The compelled-speech violations in *Tornillo* and *Pacific Gas* also resulted from interference with a speaker's desired message. In *Tornillo*, we recognized that "the compelled printing of a reply . . . tak[es] up space that could be devoted to other material the newspaper may have preferred to print," 418 U. S., at 256, and therefore concluded that this right-of-reply statute infringed the newspaper editors' freedom of speech by altering the message the paper wished to express, *id.,* at 258. The same is true in *Pacific Gas*. There, the utility company regularly included its newsletter, which we concluded was protected speech, in its billing envelope. 475 U. S., at 8–9. Thus, when the state agency ordered the utility to send a third-party newsletter four times a year, it interfered with the utility's ability to communicate its own message in its newsletter. A plurality of the Court likened this to the situation in *Tornillo* and held that the forced inclusion of the other newsletter interfered with the utility's own message. 475 U. S., at 16–18.

In this case, accommodating the military's message does not affect the law schools' speech, because the schools are not speaking when they host interviews and recruiting receptions. Unlike a parade organizer's choice of parade contingents, a law school's decision to allow recruiters on campus is not inherently expressive. Law schools facili-

tate recruiting to assist their students in obtaining jobs. A law school's recruiting services lack the expressive quality of a parade, a newsletter, or the editorial page of a newspaper; its accommodation of a military recruiter's message is not compelled speech because the accommodation does not sufficiently interfere with any message of the school.

The schools respond that if they treat military and nonmilitary recruiters alike in order to comply with the Solomon Amendment, they could be viewed as sending the message that they see nothing wrong with the military's policies, when they do. We rejected a similar argument in *PruneYard Shopping Center* v. *Robins,* 447 U. S. 74 (1980). In that case, we upheld a state law requiring a shopping center owner to allow certain expressive activities by others on its property. We explained that there was little likelihood that the views of those engaging in the expressive activities would be identified with the owner, who remained free to disassociate himself from those views and who was "not . . . being compelled to affirm [a] belief in any governmentally prescribed position or view." *Id.*, at 88.

The same is true here. Nothing about recruiting suggests that law schools agree with any speech by recruiters, and nothing in the Solomon Amendment restricts what the law schools may say about the military's policies. We have held that high school students can appreciate the difference between speech a school sponsors and speech the school permits because legally required to do so, pursuant to an equal access policy. *Board of Ed. of Westside Community Schools (Dist. 66)* v. *Mergens,* 496 U. S. 226, 250 (1990) (plurality opinion); accord, *id.,* at 268 (Marshall, J., concurring in judgment); see also *Rosenberger* v. *Rector and Visitors of Univ. of Va.,* 515 U. S. 819, 841 (1995) (attribution concern "not a plausible fear"). Surely students have not lost that ability by the time they get to law school.

16    RUMSFELD *v.* FORUM FOR ACADEMIC AND INSTITU-
TIONAL RIGHTS, INC.

Opinion of the Court

3

Having rejected the view that the Solomon Amendment impermissibly regulates *speech*, we must still consider whether the expressive nature of the *conduct* regulated by the statute brings that conduct within the First Amendment's protection. In *O'Brien*, we recognized that some forms of "'symbolic speech'" were deserving of First Amendment protection. 391 U. S., at 376. But we rejected the view that "conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *Ibid.* Instead, we have extended First Amendment protection only to conduct that is inherently expressive. In *Texas* v. *Johnson,* 491 U. S. 397, 406 (1989), for example, we applied *O'Brien* and held that burning the American flag was sufficiently expressive to warrant First Amendment protection.

Unlike flag burning, the conduct regulated by the Solomon Amendment is not inherently expressive. Prior to the adoption of the Solomon Amendment's equal-access requirement, law schools "expressed" their disagreement with the military by treating military recruiters differently from other recruiters. But these actions were expressive only because the law schools accompanied their conduct with speech explaining it. For example, the point of requiring military interviews to be conducted on the undergraduate campus is not "overwhelmingly apparent." *Johnson, supra,* at 406. An observer who sees military recruiters interviewing away from the law school has no way of knowing whether the law school is expressing its disapproval of the military, all the law school's interview rooms are full, or the military recruiters decided for reasons of their own that they would rather interview someplace else.

The expressive component of a law school's actions is not created by the conduct itself but by the speech that accompanies it. The fact that such explanatory speech is

necessary is strong evidence that the conduct at issue here is not so inherently expressive that it warrants protection under *O'Brien.* If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into "speech" simply by talking about it. For instance, if an individual announces that he intends to express his disapproval of the Internal Revenue Service by refusing to pay his income taxes, we would have to apply *O'Brien* to determine whether the Tax Code violates the First Amendment. Neither *O'Brien* nor its progeny supports such a result.

Although the Third Circuit also concluded that *O'Brien* does not apply, it held in the alternative that the Solomon Amendment does not pass muster under *O'Brien* because the Government failed to produce evidence establishing that the Solomon Amendment was necessary and effective. 390 F. 3d, at 245. The Court of Appeals surmised that "the military has ample resources to recruit through alternative means," suggesting "loan repayment programs" and "television and radio advertisements." *Id.*, at 234–235. As a result, the Government—according to the Third Circuit— failed to establish that the statute's burden on speech is no greater than essential to furthering its interest in military recruiting. *Id.*, at 245.

We disagree with the Court of Appeals' reasoning and result. We have held that "an incidental burden on speech is no greater than is essential, and therefore is permissible under *O'Brien*, so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *United States* v. *Albertini*, 472 U. S. 675, 689 (1985). The Solomon Amendment clearly satisfies this requirement. Military recruiting promotes the substantial Government interest in raising and supporting the Armed Forces—an objective that would be achieved less effectively if the military were forced to recruit on less favorable terms than other employers. The

18    RUMSFELD *v.* FORUM FOR ACADEMIC AND INSTITU-
TIONAL RIGHTS, INC.

Opinion of the Court

Court of Appeals' proposed alternative methods of recruiting are beside the point. The issue is not whether other means of raising an army and providing for a navy might be adequate. See *id.,* at 689 (regulations are not "invalid simply because there is some imaginable alternative that might be less burdensome on speech"). That is a judgment for Congress, not the courts. See U. S. Const., Art. I, §8, cls. 12–13; *Rostker*, 453 U. S., at 64–65. It suffices that the means chosen by Congress add to the effectiveness of military recruitment. Accordingly, even if the Solomon Amendment were regarded as regulating expressive conduct, it would not violate the First Amendment under *O'Brien*.

B

The Solomon Amendment does not violate law schools' freedom of speech, but the First Amendment's protection extends beyond the right to speak. We have recognized a First Amendment right to associate for the purpose of speaking, which we have termed a "right of expressive association." See, *e.g., Boy Scouts of America* v. *Dale,* 530 U. S. 640, 644 (2000). The reason we have extended First Amendment protection in this way is clear: The right to speak is often exercised most effectively by combining one's voice with the voices of others. See *Roberts* v. *United States Jaycees,* 468 U. S. 609, 622 (1984). If the government were free to restrict individuals' ability to join together and speak, it could essentially silence views that the First Amendment is intended to protect. *Ibid*.

FAIR argues that the Solomon Amendment violates law schools' freedom of expressive association. According to FAIR, law schools' ability to express their message that discrimination on the basis of sexual orientation is wrong is significantly affected by the presence of military recruiters on campus and the schools' obligation to assist them. Relying heavily on our decision in *Dale*, the Court of Appeals agreed. 390 F. 3d, at 230–235.

In *Dale*, we held that the Boy Scouts' freedom of expressive association was violated by New Jersey's public accommodations law, which required the organization to accept a homosexual as a scoutmaster. After determining that the Boy Scouts was an expressive association, that "the forced inclusion of Dale would significantly affect its expression," and that the State's interests did not justify this intrusion, we concluded that the Boy Scout's First Amendment rights were violated. 530 U. S., at 655–659.

The Solomon Amendment, however, does not similarly affect a law school's associational rights. To comply with the statute, law schools must allow military recruiters on campus and assist them in whatever way the school chooses to assist other employers. Law schools therefore "associate" with military recruiters in the sense that they interact with them. But recruiters are not part of the law school. Recruiters are, by definition, outsiders who come onto campus for the limited purpose of trying to hire students—not to become members of the school's expressive association. This distinction is critical. Unlike the public accommodations law in *Dale*, the Solomon Amendment does not force a law school "'to accept members it does not desire.'" *Id.,* at 648 (quoting *Roberts, supra,* at 623). The law schools *say* that allowing military recruiters equal access impairs their own expression by requiring them to associate with the recruiters, but just as saying conduct is undertaken for expressive purposes cannot make it symbolic speech, see *supra,* at 16, so too a speaker cannot "erect a shield" against laws requiring access "simply by asserting" that mere association "would impair its message." 530 U. S., at 653.

FAIR correctly notes that the freedom of expressive association protects more than just a group's membership decisions. For example, we have held laws unconstitutional that require disclosure of membership lists for groups seeking anonymity, *Brown* v. *Socialist Workers '74 Cam-*

20     RUMSFELD *v.* FORUM FOR ACADEMIC AND INSTITU-
TIONAL RIGHTS, INC.

Opinion of the Court

*paign Comm. (Ohio),* 459 U. S. 87, 101–102 (1982), or impose penalties or withhold benefits based on membership in a disfavored group, *Healy* v. *James,* 408 U. S. 169, 180–184 (1972). Although these laws did not directly interfere with an organization's composition, they made group membership less attractive, raising the same First Amendment concerns about affecting the group's ability to express its message.

The Solomon Amendment has no similar effect on a law school's associational rights. Students and faculty are free to associate to voice their disapproval of the military's message; nothing about the statute affects the composition of the group by making group membership less desirable. The Solomon Amendment therefore does not violate a law school's First Amendment rights. A military recruiter's mere presence on campus does not violate a law school's right to associate, regardless of how repugnant the law school considers the recruiter's message.

\*     \*     \*

In this case, FAIR has attempted to stretch a number of First Amendment doctrines well beyond the sort of activities these doctrines protect. The law schools object to having to treat military recruiters like other recruiters, but that regulation of conduct does not violate the First Amendment. To the extent that the Solomon Amendment incidentally affects expression, the law schools' effort to cast themselves as just like the schoolchildren in *Barnette*, the parade organizers in *Hurley*, and the Boy Scouts in *Dale* plainly overstates the expressive nature of their activity and the impact of the Solomon Amendment on it, while exaggerating the reach of our First Amendment precedents.

Because Congress could require law schools to provide equal access to military recruiters without violating the schools' freedoms of speech or association, the Court of

Appeals erred in holding that the Solomon Amendment likely violates the First Amendment. We therefore reverse the judgment of the Third Circuit and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE ALITO took no part in the consideration or decision of this case.