[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-16808

_____

D.C. Docket No. 0:15-cv-60185-WJZ

FORT LAUDERDALE FOOD NOT BOMBS,
NATHAN PIM,
JILLIAN PIM,
HAYLEE BECKER,
WILLIAM TOOLE,

Plaintiffs - Appellants,

versus

CITY OF FORT LAUDERDALE,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 22, 2018)

Before TJOFLAT and JORDAN, Circuit Judges, and STEELE,[*] District Judge.

_____

[*] Honorable John E. Steele, United States District Judge for the Middle District of Florida, sitting by designation.

JORDAN, Circuit Judge:

In understanding what is going on around us, context matters.  Food shared with company differs greatly from a meal eaten alone.  Unlike a solitary supper, a feast requires the host to entertain and the guests to interact.  Lady Macbeth knew this, and chided her husband for "not giv[ing] the cheer" at the banquet depicted in Shakespeare's play.  As she explained:  "To feed were best at home; From thence, the sauce to meat is ceremony.  Meeting bare without it."  William Shakespeare, The Tragedy of Macbeth, Act III, scene 4 (1606).

Fort Lauderdale Food Not Bombs, a non-profit organization, hosts weekly events at a public park in Fort Lauderdale, sharing food at no cost with those who gather to join in the meal.  FLFNB's members set up a table and banner with the organization's name and emblem in the park and invite passersby to join them in sitting down and enjoying vegetarian or vegan food.  When the City of Fort Lauderdale enacted an ordinance in 2014 that restricted this food sharing, FLFNB and some of its members (whom we refer to collectively as FLFNB) filed suit under 42 U.S.C. § 1983.  They alleged that the ordinance and a related park rule violated their First Amendment rights of free speech and free association and were unconstitutionally vague.

The district court granted summary judgment in favor of the City.  It held that FLFNB's outdoor food sharing was not expressive conduct protected by the

2

First Amendment and that the ordinance and park rule were not vague. *See Ft. Lauderdale Food Not Bombs v. City of Ft. Lauderdale*, 2016 WL 5942528 (S.D. Fla. Oct. 3, 2016) (final judgment). FLFNB appeals those rulings.

Resolving the issue left undecided in *First Vagabonds Church of God v. City of Orlando, Florida*, 638 F.3d 756, 760 (11th Cir. 2011) (en banc), we hold that on this record FLFNB's outdoor food sharing is expressive conduct protected by the First Amendment. We therefore reverse the district court's grant of summary judgment in favor of the City. On remand, the district court will need to determine whether the ordinance and park rule violate the First Amendment and whether they are unconstitutionally vague.

## I

FLFNB, which is affiliated with the international organization Food Not Bombs, engages in peaceful political direct action. It conducts weekly food sharing events at Stranahan Park, located in downtown Fort Lauderdale. Stranahan Park, an undisputed public forum, is known in the community as a location where the homeless tend to congregate and, according to FLFNB, "has traditionally been a battleground over the City's attempts to reduce the visibility of homelessness." D.E. 41 at 8.

At these events, FLFNB distributes vegetarian or vegan food, free of charge, to anyone who chooses to participate. FLFNB does not serve food as a charity, but

rather to communicate its message "that [ ] society can end hunger and poverty if we redirect our collective resources from the military and war and that food is a human right, not a privilege, which society has a responsibility to provide for all." D.E. 39 at 1. Providing food in a visible public space, and partaking in meals that are shared with others, is an act of political solidarity meant to convey the organization's message.

FLFNB sets up a table underneath a gazebo in the park, distributes food, and its members (or, as the City describes them, volunteers) eat together with all of the participants, many of whom are homeless individuals residing in the downtown Fort Lauderdale area. *See* D.E. 40-23. FLFNB's set-up includes a banner with the name "Food Not Bombs" and the organization's logo—a fist holding a carrot—and individuals associated with the organization pass out literature during the event. *See id.*

On October 22, 2014, the City enacted Ordinance C-14-42, which amended the City's existing Uniform Land Development Regulations. Under the Ordinance, "social services" are

> [a]ny service[s] provided to the public to address public welfare and health such as, but not limited to, the provision of food; hygiene care; group rehabilitative or recovery assistance, or any combination thereof; rehabilitative or recovery programs utilizing counseling, self-help or other treatment of assistance; and day shelter or any combination of same.

4

D.E. 38-1, § 1.B.6.  The Ordinance regulates "social service facilities," which include an "outdoor food distribution center."  D.E. 38-1, § 1.B.8.  An "outdoor food distribution center" is defined as

> [a]ny location or site temporarily used to furnish meals to members of the public without cost or at a very low cost as a social service as defined herein.  A food distribution center shall not be considered a restaurant.

D.E. 38-1, § 1.B.4.

The Ordinance imposes restrictions on hours of operation and contains requirements regarding food handling and safety.  Depending on the specific zoning district, a social service facility may be permitted, not permitted, or require a conditional use permit.  *See* D.E. 38-1 at 9.  Social service facilities operating in a permitted use zone are still subject to review by the City's development review committee.  *See id.*

Stranahan Park is zoned as a "Regional Activity Center – City Center," D.E. 38-34, and requires a conditional use permit.  *See* D.E. 38-1 at 9.  To receive a conditional use permit, applicants must demonstrate that their social service facilities will meet a list of requirements set out in § 1.E of the Ordinance.

The City's "Parks and Recreation Rules and Regulations" also regulate social services.  Under Park Rule 2.2,

> [p]arks shall be used for recreation and relaxation, ornament, light and air for the general public.  Parks shall not be used for business or

5

social service purposes unless authorized pursuant to a written agreement with City.

As used herein, social services shall include, but not be limited to, the provision of food, clothing, shelter or medical care to persons in order to meet their physical needs.

D.E. 38-35.

The City has voluntarily not enforced Ordinance C-14-42 and Park Rule 2.2 since February of 2015.

## II

FLFNB contends that the Ordinance and Park Rule 2.2 violate its rights to free speech and free association guaranteed by the First Amendment, which is made applicable to state and local governments through the Due Process Clause of the Fourteenth Amendment. *See* D.E. 1 at 21; *Gitlow v. New York*, 268 U.S. 652, 666 (1925). It also argues that the ordinance and regulation are unconstitutionally vague, both facially and as applied. *See* D.E. 1 at 27.

The City defends the district court's summary judgment ruling. It asserts that the food sharing events at Stranahan Park are not expressive conduct because the act of feeding is not inherently communicative of FLFNB's "intended, unique, and particularized message." *See* City's Br. at 35. Understanding the events, according to the City, depends on explanatory speech, such as the signs and banners, indicating that FLFNB's conduct is not inherently expressive.

6

We review the district court's grant of summary judgment *de novo*. *See Rodriguez v. City of Doral*, 863 F.3d 1343, 1349 (11th Cir. 2017). The same plenary standard applies to questions of constitutional law. *See Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1181 (11th Cir. 2017) (en banc). In reviewing the parties' cross-motions for summary judgment, we "draw all inferences and review all evidence in the light most favorable to the non-moving party." *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012) (quotation marks omitted and alteration adopted).

There is an additional twist to these standards of review in the First Amendment context. Because "the reaches of the First Amendment are ultimately defined by the facts it is held to embrace . . . we must thus decide for ourselves whether a given course of conduct falls on the near or far side of the line of constitutional protection." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 567 (1995). *See also Flanigan's Enters., Inc. v. Fulton Cnty., Ga.*, 596 F.3d 1265, 1276 (11th Cir. 2010) (applying First Amendment independent review standard in a summary judgment posture).

## III

Constitutional protection for freedom of speech "does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). The First Amendment guarantees "all people [ ] the right to engage not only in 'pure

7

speech,' but 'expressive conduct' as well." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004) (citing *United States v. O'Brien*, 391 U.S. 367, 376–77 (1968)). As one First Amendment scholar has explained, "[a] sharp line between 'words' and 'expressive acts' cannot . . . be justified in Madisonian terms. The constitutional protection is afforded to 'speech,' and acts that qualify as signs with expressive meaning qualify as speech within the meaning of the Constitution." Cass R. Sunstein, Democracy and the Problem of Free Speech 181 (1993).

Several decades ago, the Supreme Court formulated a two-part inquiry to determine whether conduct is sufficiently expressive under the First Amendment: (1) whether "[a]n intent to convey a particularized message was present;" and (2) whether "in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Spence v. Washington*, 418 U.S. 405, 410–411 (1974). Since then, however, the Court has clarified that a "narrow, succinctly articulable message is not a condition of constitutional protection" because "if confined to expressions conveying a 'particularized message' [the First Amendment] would never reach the unquestionably shielded painting of Jackson Pollack, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll." *Hurley*, 515 U.S. at 569 (citing *Spence*, 418 U.S. at 411). So, "in determining whether conduct is expressive, we ask whether the reasonable person

would interpret it as *some* sort of message, not whether an observer would necessarily infer a *specific* message." *Holloman*, 370 F.3d at 1270 (emphasis in original) (citing *Hurley*, 515 U.S. at 569). *See also Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 66 (2006) ("*FAIR*") (explaining that, to merit First Amendment protection, conduct must be "inherently expressive").

## A

On this record, we have no doubt that FLFNB intended to convey a certain message. *See Spence*, 418 U.S. at 410. Neither the district court nor the City suggest otherwise. *See* D.E. 49 at 1, 2; D.E. 78 at 24. As noted, the message is "that [ ] society can end hunger and poverty if we redirect our collective resources from the military and war and that food is a human right, not a privilege, which society has a responsibility to provide for all." D.E. 39 at 1. Food sharing in a visible public space, according to FLFNB, is "meant to convey that all persons are equal, regardless of socio-economic status, and that everyone should have access to food as a human right." *Id*. at 2.

"Whether food distribution [or sharing] can be expressive activity protected by the First Amendment under particular circumstances is a question to be decided in an as-applied challenge[.]" *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1032 (9th Cir. 2006). The critical question, then, is "whether the reasonable person would interpret [FLFNB's conduct] as *some* sort of

9

message." *Holloman*, 370 F.3d at 1270. In answering this question, "the context in which a symbol is used for purposes of expression is important, for the context may give meaning to the symbol." *Spence*, 418 U.S. at 410 (citing *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969)). History may have been quite different had the Boston Tea Party been viewed as mere dislike for a certain brew and not a political protest against the taxation of the American colonies without representation. *See* James E. Leahy, *Flamboyant Protest, the First Amendment, and the Boston Tea Party*, 36 Brook. L. Rev. 185, 210 (1970). *Cf.* Rodney A. Smolla, Free Speech in an Open Society 26 (1992) (maintaining that mass demonstrations "are perhaps the single *most* vital forms of expression in human experience"); Thomas I. Emerson, The System of Freedom of Expression 293 (1970) ("The presence of people in the street or other open public place for the purpose of expression, even in large numbers, would also be deemed part of the 'expression.'").

It should be no surprise, then, that the circumstances surrounding an event often help set the dividing line between activity that is sufficiently expressive and similar activity that is not. Context separates the physical activity of walking from the expressive conduct associated with a picket line or a parade. *See United States v. Grace*, 461 U.S. 171, 176 (1983) ("There is no doubt that as a general matter peaceful picketing and leafletting are expressive activities involving 'speech'

protected by the First Amendment."); *Hurley*, 515 U.S. at 568 ("[W]e use the word 'parade' to indicate marchers who are making some sort of collective point, not just to each other but to bystanders along the way."). Context also differentiates the act of sitting down—ordinarily not expressive—from the sit-in by African Americans at a Louisiana library which was understood as a protest against segregation. *See Brown v. Louisiana*, 383 U.S. 131, 141–42 (1966). And context divides simply "[b]eing in a state of nudity," which is "not an inherently expressive condition," from the type of nude dancing that is to some degree constitutionally protected. *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000) (quotation omitted). *Compare also Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565–566 (1991) (nude dancing is expressive conduct, although "only marginally so"), *with City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989) (noting that "recreational dancing" by clothed dance hall patrons is not sufficiently expressive).[1]

The district court concluded that "outdoor food sharing does not convey [FLFNB's] particularized message unless it is combined with other speech, such as that involved in [FLFNB's] demonstrations." D.E. 78 at 24. This focus on FLFNB's particularized message was mistaken. As *Holloman* teaches, the inquiry

---

[1] *See also Stewart v. Baldwin Cnty. Bd. of Educ.*, 908 F.3d 1499, 1501, 1505 (11th Cir. 1990) (holding that a school employee's "quiet and non-disruptive" early departure from a mandatory meeting communicated an objection to the superintendent's position).

11

is whether the reasonable person would interpret FLFNB's food sharing events as "*some* sort of message."  370 F.3d at 1270.

## B

The district court also failed to consider the context of FLFNB's food sharing events and instead relied on the notion that the conduct must be "combined with other speech" to provide meaning.  *See* D.E. 78 at 24.  As we explain, the surrounding circumstances would lead the reasonable observer to view the conduct as conveying some sort of message.  That puts FLFNB's food sharing events on the expressive side of the ledger.

First, FLFNB sets up tables and banners (including one with its logo) and distributes literature at its events.  This distinguishes its sharing of food with the public from relatives or friends simply eating together in the park.  *Cf. Hurley*, 515 U.S. at 570 (holding that participation in a parade was expressive in part because group members "distributed a fact sheet describing the members' intentions" and held banners while they marched).

Second, the food sharing events are open to everyone, and the organization's members or volunteers invite all who are present to participate and to share in their meal at the same time.  That, in and of itself, has social implications.  *See* Mary Douglas, "Deciphering a Meal," in Implicit Meanings: Selected Essays in

Anthropology 231 (1975) ("Like sex, the taking of food has a social component, as well as a biological one.").

Third, FLFNB holds its food sharing in Stranahan Park, a public park near city government buildings. *See Spence*, 418 U.S. at 410. The parties agree that Stranahan Park is a traditional public forum. *See* D.E. 39 at ¶ 9; D.E. 49 at ¶ 9. That agreement is not surprising, for, public parks have, "time out of mind, [ ] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)). They are places "historically associated with the exercise of First Amendment rights." *Carey v. Brown*, 447 U.S. 455, 460 (1980). And they are places that "commonly play an important role in defining the identity that a city projects to its own residents and to the outside world." *Pleasant Grove City v. Summum*, 555 U.S. 460, 472 (2009). Although the choice of location alone is not dispositive, it is nevertheless an important factor in the "factual context and environment" that we must consider. *See Spence*, 418 U.S. at 409–10. *Cf. Johnson*, 491 U.S. at 406 (concluding that a flag burning demonstration at Dallas City Hall conveyed an anti-government/lack of patriotism message).

Fourth, the record demonstrates without dispute that the treatment of the City's homeless population is an issue of concern in the community. The City

13

itself admits that its elected officials held a public workshop "on the Homeless Issue" in January of 2014, and placed the agenda and minutes of that meeting in the summary judgment record. *See* City's Br. at 12; D.E. 38 at ¶ 16; D.E. 38-19. That workshop included several "homeless issues, including public feedings in the C[ity's] parks and public areas." D.E. 38 at ¶ 16. It is also undisputed that the status of the City's homeless population attracted local news coverage beginning years before that 2014 workshop. We think that the local discussion regarding the City's treatment of the homeless is significant because it provides background for FLFNB's events, particularly in light of the undisputed fact that many of the participants are homeless. This background adds to the likelihood that the reasonable observer would understand that FLFNB's food sharing sought to convey some message. *See Johnson*, 491 U.S. at 406 (noting that flag burning "coincided with the convening of the Republican Party and its renomination of Ronald Reagan for President"); *Spence*, 418 U.S. at 410 (noting that the exhibition of a peace symbol taped on a flag "was roughly simultaneous with and concededly triggered by the Cambodian incursion and the Kent State tragedy"); *Tinker*, 393 U.S. at 505 (noting that a black armband was worn during the Vietnam War).

Fifth, it matters that FLFNB uses the sharing of food as the means for conveying its message, for the history of a particular symbol or type of conduct is instructive in determining whether the reasonable observer may infer some

14

message when viewing it.  *See Monroe v. State Court of Fulton Cnty.*, 739 F.2d 568, 571 n.3 (11th Cir. 1984) (explaining that, to be sufficiently expressive, "the actor must have reason to expect that his audience will recognize his conduct as communication") (citation omitted).  In *Johnson*, for example, the Supreme Court explained the historical importance of our national flag, noting that it is "the one visible manifestation of two hundred years of nationhood" and that "[c]auses and nations, political parties, lodges and ecclesiastical groups seek to knit the loyalty of their followings to a flag or banner."  491 U.S. at 405 (quotations and citations omitted).  Given this history, the American flag was recognized as a symbol for the United States, and its burning constituted expressive conduct.  *See id*. at 405–06. *See also Buehrle v. City of Key West*, 813 F.3d 973, 978 (11th Cir. 2015) (affirming the district court's determination on summary judgment that tattooing is protected activity, and relying in part on a historical analysis).

Like the flag, the significance of sharing meals with others dates back millennia.  The Bible recounts that Jesus shared meals with tax collectors and sinners to demonstrate that they were not outcasts in his eyes.  *See Mark* 2:13–17; *Luke* 5:29–32.  In 1621, Pilgrims and Native Americans celebrated the harvest by sharing the First Thanksgiving in Plymouth.  President Abraham Lincoln established Thanksgiving as a national holiday in 1863, proclaiming it as a day of "Thanksgiving and Praise to our beneficent Father" in recognition of blessings

15

such as "fruitful fields and healthful skies."   John G. Nicolay & John Hay, 2 Abraham Lincoln: Complete Works 417–418 (1894).   Americans have celebrated this holiday ever since, commonly joining with family and friends for traditional fare like turkey and pumpkin pie.

On this record, FLFNB's food sharing events are more than a picnic in the park.   FLFNB has established an intent to "express[ ] an idea through activity," *Spence*, 418 U.S. at 411, and the reasonable observer would interpret its food sharing events as conveying *some* sort of message.   *See Holloman*, 370 F.3d at 1270.

## C

The City, echoing the district court's analysis, relies on *FAIR*, in which the Supreme Court explained that "[t]he fact that [ ] explanatory speech is necessary is strong evidence that the conduct at issue here is not so inherently expressive that it warrants protection under *O'Brien*."   547 U.S. at 66.   This language from *FAIR*, however, does not mean that conduct loses its expressive nature just because it is also accompanied by other speech.   If it did, the fact that the paraders in *Hurley* were "carrying flags and banners with all sorts of messages" would have placed their conduct outside the realm of First Amendment protection.   *See Hurley*, 515 U.S. at 569.   *See also Nat'l Socialist Party of Am. v. Village of Skokie*, 432 U.S. 43, 43–44 (1977) (per curiam) (considering the denial of a stay of an injunction in a

case where members of the National Socialist Party of America sought to parade in uniforms displaying a swastika).  The critical question is whether the explanatory speech is *necessary* for the reasonable observer to perceive a message from the conduct.

In *FAIR*, a number of law schools claimed that the Solomon Amendment—which denies federal funding to an institution that prohibits the military from gaining access to its campus and students "'for purposes of military recruiting in a manner that is at least equal in quality and scope to access to campuses and to students that is provided to any other employer'"—violated their rights under the First Amendment.  *See* 547 U.S. at 55 (quoting 10 U.S.C. § 938(b)).  Among other things, the schools asserted that their restriction of military recruiters' access to law students due to a disagreement with the government's then-existing policy excluding homosexuals from the military (such as, for example, requiring them to interview students on the undergraduate campus) was protected expressive conduct.  *See id.* at 51.

The Supreme Court held that it was not.  *See id.* at 66.  It noted that "law schools 'expressed' their disagreement with the military by treating military recruiters differently from other recruiters.  But these actions were expressive only because the law schools accompanied their conduct with speech explaining it."  *Id.* at 66.  Such speech was necessary to provide explanation because "the point of

17

requiring military interviews to be conducted on the undergraduate campus is not 'overwhelmingly apparent.' An observer who sees military recruiters interviewing away from the law school has no way of knowing whether the law school is expressing its disapproval of the military, all the law school's interview rooms are full, or the military recruiters decided for reasons of their own that they would rather interview someplace else." *Id*. (citation omitted). Thus, the "explanatory speech" in *FAIR* was speech that was necessary to explain the law school's conduct. Without it, the conduct alone (requiring military recruiters to see students off-site) was not sufficiently expressive and the reasonable observer would not be likely to infer some message.

Explanatory speech is not necessary in this case. Although such speech cannot create expressive conduct, *see id.* at 66, context still matters. Here, the presence of banners, a table, and a gathering of people sharing food with all those present in a public park is sufficiently expressive. The reasonable observer at FLFNB's events would infer some sort of message, e.g., one of community and care for all citizens. Any "explanatory speech"—the text and logo contained on the banners—is not needed to convey that message. Whether those banners said "Food Not Bombs" or "We Eat With the Homeless" adds nothing of legal significance to the First Amendment analysis. The words "Food Not Bombs" on those banners might be required for onlookers to infer FLFNB's *specific* message

18

that public money should be spent on providing food for the poor rather than funding the military, but it is enough if the reasonable observer would interpret the food sharing events as conveying "some sort of message." *See Holloman*, 370 F.3d at 1270 (holding that a "generalized message of disagreement or protest directed toward [a teacher], the school, or the country in general" is sufficient under the *Spence* test, as modified by *Hurley*) (citing *Hurley*, 515 U.S. at 569).

We decline the City's invitation, *see* City's Br. at 21, to resurrect the *Spence* requirement that it be likely that the reasonable observer would infer a particularized message. The Supreme Court rejected this requirement in *Hurley*, 515 U.S. at 569 (a "narrow, succinctly articulable message is not a condition of constitutional protection"), and it is not appropriate for us to bring it back to life.

The district court expressed some concern that *FAIR* does not align with the understanding in "*Holloman*[ ] and perhaps also *Hurley*[ ] . . . of a particularized message." D.E. 78 at 21. We do not believe that *FAIR* undermines *Hurley* or that it abrogates *Holloman*. *FAIR* does not discuss the need for a particularized message at all. Nor does it cite to how *Spence* phrased that requirement. *FAIR* did, however, discuss *Hurley*. The Supreme Court explained that "the law schools' effort to cast themselves as just like . . . the parade organizers in *Hurley* . . . plainly overstates the expressive nature of their activity," and was therefore unavailing. *FAIR*, 547 U.S. at 70. In our view, FLFNB's conduct here is more like that of the

19

paraders in *Hurley* than that of the law schools in *FAIR*.  The reasonable observer of the law schools' conduct in *FAIR* was not likely to infer *any* message beyond that the interview rooms were full or that the military preferred to interview elsewhere.  *See id.* at 66.  FLFNB's food sharing events are markedly different.  Due to the context surrounding them, the reasonable observer would infer some sort of message.

## IV

"[T]he nature of [FLFNB's] activity, combined with the factual context and environment in which it was undertaken, lead to the conclusion that [FLFNB] engaged in a form of protected expression."  *Spence*, 418 U.S. at 409–10.  We therefore reverse the district court's grant of summary judgment in favor of the City.

We decline to address whether Ordinance C-14-42 and Park Rule 2.2 violate the First Amendment and whether they are unconstitutionally vague.  These issues are best left for the district court to take up on remand.[2]

**REVERSED AND REMANDED.**

---

[2] The district court stated that its rejection of FLFNB's vagueness challenges was affected, although "to a lesser extent," by its ruling that FLFNB's conduct was not protected by the First Amendment.  *See* D.E. 78 at 27.  Given our ruling that FLFNB's food sharing events constitute expressive conduct, we think that the district court is in the best position to reassess its ruling on the vagueness issues in the first instance.