# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1655
No. 07-1749

_____

| | | |
|---|---|---|
| American Growers Insurance Company, | * | |
| | * | |
| Plaintiff - Appellee/ | * | |
| Cross-Appellant, | * | |
| | * | Appeals from the United States |
| v. | * | District Court for the |
| | * | Southern District of Iowa. |
| Federal Crop Insurance Corporation, | * | |
| A corporation within the United States | * | |
| Department of Agriculture; Risk | * | |
| Management Agency, an agency of and | * | |
| within the United States Department of | * | |
| Agriculture, | * | |
| | * | |
| Defendants - Appellants/ | * | |
| Cross-Appellees. | * | |

_____

Submitted: March 12, 2008
Filed: July 15, 2008

_____

Before MURPHY, ARNOLD, and BENTON, Circuit Judges.

_____

MURPHY, Circuit Judge.

This action was brought by federal crop insurance provider American Growers Insurance Company (Insurer), alleging that the Federal Crop Insurance Corporation (FCIC) erred under 7 U.S.C. § 1508(j)(3) by adding prevented planting coverage to

basic federal crop insurance policies without increasing the premium rate that the insurance company could charge. Both sides filed motions for summary judgment. The district court granted summary judgment in favor of the FCIC for crop year 1996 and in favor of Insurer for crop year 1997, awarding it $950,025 in damages. Both sides appeal. We reverse.

## I.

### A.

In 1938 Congress passed The Federal Crop Insurance Act, 7 U.S.C. §§ 1501 *et seq.* The Act created the federal crop insurance program, which is administered and regulated by the FCIC. The United States Department of Agriculture's Risk Management Agency was created by Congress in 1996 to operate and manage the FCIC; the two entities are referred to here jointly as the FCIC. The multiple peril crop insurance (MPCI) policies offered under the Act cover numerous risks to crops including fire, flood, drought, and other natural disasters. The FCIC directly provided crop insurance policies to producers until 1980 when the Act was amended. The FCIC then began to contract with approved private insurance companies to offer the policies to producers. 7 U.S.C. § 1507(c). Insurer is one of the approved insurance companies.

The Act, and related regulations issued by the Secretary of Agriculture in 7 C.F.R. Part IV, give the FCIC significant control over all aspects of the federal crop insurance program. One way in which it exerts this control is by executing a cooperative financial assistance agreement called a standard reinsurance agreement (SRA) with each approved insurance company. The SRA authorizes the insurer to sell and service federal crop insurance policies and obligates the FCIC to reinsure the policies, but only if they are "written on terms, *including premium rates*, approved by [the FCIC]." 7 C.F.R. § 400.166(a) (emphasis added). The FCIC and Insurer

-2-

executed an SRA for the 1996 crop year[1] and renewed it for all crop years at issue in these appeals. Pursuant to the terms in Section III of the SRA, the FCIC subsidizes the premiums paid to Insurer by producers, and under Section IV it compensates Insurer for administrative and operating expenses, calculated as a percentage of the premiums charged to producers. Insurer profits mainly from these administrative and operating expense reimbursements, as well as from underwriting gains when premiums exceed claims paid.

The FCIC develops the premium rates which insurers may charge on MPCI policies. Rates are developed for each crop within a geographic area, usually a county. The Act requires that the FCIC set premium rates at a level which it determines to be "actuarially sufficient" to attain a given ratio of anticipated loss claims to the premiums expected to be collected for the entire crop insurance program each year. 7 U.S.C. § 1508(d)(1). The FCIC is also required to "take such actions as are necessary to improve the actuarial soundness of federal multiple peril crop insurance." § 1506(o).

The ratemaking process is complex, but it starts with the calculation of the expected crop loss ratio, by crop and by county. That ratio represents the amount of loss claims the FCIC predicts insurers will have to pay relative to their total potential liability. To calculate this ratio, FCIC actuaries look at historical annual crop loss data from each county. For each year of available data, total claims paid are divided by the total potential liability to determine the historical annual loss cost ratio for each crop in a county. For any year in which a crop was severely affected and loss claims in the county were unusually high, the ratio is capped so as to minimize the impact of unusual events on the overall expected ratio for that county (the "state excess" described below). The expected loss cost ratio for a county is determined by

---

[1]A crop year begins on July 1 and ends on June 30; thus crop year 1996 began on July 1, 1995 and ended on June 30, 1996.

averaging these adjusted annual loss cost ratios, and factoring in the average loss cost ratios of the surrounding counties.

The expected loss cost ratio or loss cost rate is the major component of the overall MPCI premium rate, but there are several others. Another component allows for a reasonable reserve in the event of unusually high loss claims, calculated by dividing the expected loss cost rate by a factor less than 1.0. Another is the state excess premium rate, which represents the statewide aggregate of all historically aberrant loss amounts distributed back to the counties to spread the impact of aberrant losses. Yet another is the basic prevented planting premium rate at issue here. While typical MPCI coverage applies to a crop which is planted but then destroyed by a natural disaster, *basic prevented planting coverage* applies when a producer is prevented from planting a crop by the end of the traditional planting period because of a natural disaster such as flooding. The producer is reimbursed for a percentage of the estimated crop yield value, but may not plant another crop in that field during the same growing season.[2]

Prevented planting coverage was an optional coverage which producers could purchase in addition to an MPCI policy until the 1994 crop year, when the FCIC added it to every MPCI policy. Unlike expected loss cost ratios which are developed at a county level, prevented planting rates are developed for two or three major regions of the country, depending on the crop. Two memoranda authored by an FCIC actuary show that in developing the prevented planting premium rates for the 1994 crop year, the FCIC considered data regarding prior prevented planting claims and

---

[2]Some of Insurer's original claims related to *additional* prevented planting coverage. With such coverage a producer who is prevented from planting receives from its insurer a lower rate of compensation than under basic prevented planting coverage, but is allowed to plant a different crop in the same field for that same growing season. Insurer appeals only issues related to basic prevented planting coverage.

expectations for rainfall and relative humidity. For regions of the country where the likelihood of natural disasters was high, the prevented planting premium rate was set at 0.2 or 0.4 percent. In the arid Western region covering most states west of the Mississippi, however, the FCIC assigned a 0.0 percent prevented planting premium rate for the 1994 crop year. As a result, insurers issuing MPCI policies in the Western region for 1994 were providing prevented planting coverage, but the overall premium rate charged to producers was the same as if prevented planting coverage were not included. The FCIC kept the prevented planting premium rate for the Western region at 0.0 percent for crop year 1995.

During the spring of 1995 parts of several states in the Western region experienced excessive rain and flooding which prevented producers from planting insured crops by the final spring planting date. Data regarding claims for losses from this flooding were not available to the FCIC at the time it set premium rates for crop year 1996, and the FCIC kept the prevented planting premium rate at 0.0 percent.

The 1995 flood data was available before the 1997 premium rates were set, but in April 1996 the FCIC decided to limit its 1997 premium rate reviews to the most serious problem areas. It decided to direct most of its resources that year toward reengineering its entire ratemaking process. That included improving the flow of information between offices, increasing the accuracy of data utilized to make rates, and reviewing certain of its ratemaking methodologies.

The prevented planting premium rates were deemed not to be a problem area and therefore remained at 0.0 percent for crop year 1997. In 1998 the FCIC increased the prevented planting premium rate for the Western region to 0.2 percent. The FCIC said that this increase was based in part on quantitative historical information and also on some qualitative changes in the coverage.

B.

Congress has waived sovereign immunity for suits against the FCIC under 7 U.S.C. § 1506(d), which gives district courts original jurisdiction over actions "brought by or against [the FCIC]" subject to 7 U.S.C. § 6912(e), a mandatory but nonjurisdictional exhaustion requirement under which an insurer must exhaust all administrative appeal procedures required by law or regulation before bringing a district court action against the FCIC. See Ace Prop. & Cas. Ins. Co. v. FCIC, 440 F.3d 992, 999-1000 (8th Cir. 2006); Munsell v. Dep't of Ag., 509 F.3d 572, 581 (D.C. Cir. 2007); McBride Cotton & Cattle Corp. v. Veneman, 290 F.3d 973, 980 (9th Cir. 2002); but see Bastek v. FCIC, 145 F.3d 90, 94-95 (2d Cir. 1998) (§ 6912(e) is mandatory jurisdictional exhaustion requirement).

One instance in which an insurer is required to exhaust administrative appeal procedures is when it is claiming that the FCIC has not acted in accord with the provisions of its SRA. In those circumstances the insurer must first seek an administrative determination from the FCIC. 7 C.F.R. § 400.169(a). It may then appeal an adverse ruling by the FCIC to the United States Department of Agriculture (USDA) Board of Contract Appeals (Board), which has jurisdiction to review determinations by the FCIC. 7 C.F.R. §§ 400.169(d), 24.4(b).[3] The Board's decision is the final administrative action, 7 C.F.R. § 24.4.(b), which may be reviewed by the district court if brought within six years of the final agency action, including any decision on a motion for reconsideration, 5 U.S.C. § 704 (right to judicial review of final agency action); 28 U.S.C. § 2401(a) (six year limitations period applies where no other period enumerated in statute).

[3]In 2007 the USDA issued a final rule amending the regulations to reflect the legal termination of the Agriculture Board of Contract Appeals and the creation of the Civilian Board of Contract Appeals. Although the rule had no effect on this case, it consolidated eight civilian boards of contract appeals into a single entity which now has jurisdiction over administrative appeals arising under SRAs. See 72 Fed. Reg. 31437-01, 31437 (June 7, 2007).

II.

A.

On June 10, 1998, Insurer submitted a claim to the FCIC seeking "indemnity payments for fiscal year 1996. . .incurred in connection with 1996 prevented planting changes." It maintained that the FCIC erred when it set the 1996 prevented planting premium rate at 0.0 percent for the Western region and that this amounted to a material breach of the SRA. The FCIC denied the claim, and Insurer appealed to the Board. Insurer argued to the Board that the FCIC had breached the 1996 SRA by "failing to adjust premium rates to reflect" the 1996 prevented planting changes, by "failing to set actuarially sound premium [prevented planting] rates," and by instituting the prevented planting changes for 1996 without providing Insurer with "adequate compensation for assuming the increased risks associated with said changes."

Following discovery, the Board panel on June 15, 2000 granted summary judgment in favor of the FCIC in a divided decision. Although two administrative law judges concurred in findings of fact and the judgment, they each wrote separately; the third dissented. The majority agreed on two main points: 1) that Insurer had not proven that Congress waived FCIC's sovereign immunity to permit a challenge to the premium rates because 7 U.S.C. § 1508(d)(1) "vests [the FCIC] with the discretion to set rates and allocate risks" at a level that *it* determines to be actuarially sufficient to attain certain expected loss ratios, and 2) that even if the statute allowed Insurer to challenge the FCIC's ratesetting decisions, it did not require the FCIC "to establish actuarially sufficient premium rates for a particular crop, county, or incidence (such as prevented planting)." The majority concluded further that the statute does require the FCIC to determine that the rates are actuarially sufficient to address "all the plans of insurance" when analyzed in the aggregate and that Insurer had not presented any evidence that the FCIC did not meet that requirement. This was the final agency

determination under 7 C.F.R. § 24.4(b) regarding the 1996 crop year. On September 7, 2000 the panel denied Insurer's motion for reconsideration of that decision.

B.

Insurer filed this action against the FCIC in federal district court on November 27, 2001, seeking damages for breach of contract and statutory violations. It amended the complaint twice over the following 18 months until it included five counts. In Count I, Insurer claimed that the FCIC's ratesetting for crop year 1996 breached the SRA. The district court dismissed that count because it asserted breach of contract for the 1996 crop year rather than seeking review of the decision already made on that claim by the Board. The court also determined that Count III, a constitutional takings claim, was premised on the same breach of contract claim pled in Count I and dismissed it as well. Insurer has not appealed either dismissal.

In Counts II and V, Insurer sought indemnification from the FCIC under 7 U.S.C. § 1508(j)(3). That statute requires the FCIC to provide "approved insurance providers with indemnification, including costs and reasonable attorney fees incurred. . .due to errors or omissions on the part of [the FCIC]." Insurer alleged that certain decisions of the FCIC amounted to a compensable error or omission under § 1508(j)(3) (assignment of a premium rate of 0.0 percent for 1996 and 1997, and 0.2 percent beginning in 1998 for the Western region prevented planting coverage). In the event that original jurisdiction was found to be lacking over the § 1508(j)(3) claims, Count IV requested review of the Board's decision regarding crop year 1996.

The parties filed cross motions for summary judgment on Counts II and V. The FCIC argued that to the extent that these claims arose from the same nucleus of operative facts as Insurer's appeal to the Board about the 1996 crop year, they were barred by res judicata. As to the 1997 – 2001 claims, the FCIC said Insurer had failed to exhaust its administrative remedies. The FCIC argued in the alternative that the district court should grant summary judgment in its favor because § 1508(j)(3) does

-8-

not provide for direct claims against it by an insurer but rather permits insurer to seek indemnification from the FCIC for a loss claim made against them by a producer.

The district court acknowledged that for 1996 "the claims brought before the [Board] and the present action both originate from defendants' conduct in revising its prevented planting coverage policies." The court concluded, however, that neither res judicata nor exhaustion requirements applied because the § 1508(j)(3) claims fell outside of the Board's jurisdiction, which it found was limited to the Contract Disputes Act, 41 U.S.C. §§ 601 *et seq.* Even if the Board had jurisdiction to hear the claims, the court decided any resort to the Board would be futile because it had no authority to award the money damages requested by Insurer. Finally, the district court pointed out that § 1508(j)(3) "contains no language limiting its application only to indemnification for claims brought by insureds" and concluded that it covered Insurer's claims regarding the FCIC's ratesetting decisions. Am. Growers v. FCIC, 2003 WL 1233073 **2-3 (March 3, 2003). Because it found that it had original jurisdiction to review Insurer's § 1508(j)(3) claims, the district court dismissed Insurer's alternative request in Count IV for judicial review of the Board's decision regarding the 1996 crop year. Insurer has not appealed that dismissal.

In addressing the merits of Insurer's claims under 7 U.S.C. § 1508(j)(3) in Counts II and V, the district court limited its review to the administrative record developed before the Board. Employing an arbitrary and capricious standard, it granted summary judgment in favor of the FCIC for crop year 1996. Because data regarding claims for losses from the 1995 flooding had not been available when the FCIC set the 1996 rates, the court concluded that the agency's decision to keep the prevented planting premium load at 0.0 percent for 1996 did not violate § 1508(j)(3). The court also granted summary judgment in favor of the FCIC for crop years 1998 through 2001 because the FCIC had increased the prevented planting premium to 0.2 percent for those crop years and had not acted arbitrarily or capriciously.

With regard to the 1997 crop year, the district court found that the FCIC knew at the time it was setting premiums that Insurer had been paying prevented planting claims during the 1995 and 1996 crop years. The court concluded that the FCIC's decision "to maintain a zero premium for prevented planting coverage in the Western region in 1997, in the face of known prevented planting losses, was arbitrary and capricious, and therefore an 'error or omission' under 7 U.S.C. § 1508(j)(3)." It granted summary judgment in favor of Insurer for the 1997 crop year and eventually awarded it damages of $950,025. The damages were based on the amount of premiums and administrative and operating expense reimbursements Insurer would have been entitled to if the FCIC had set the 1997 prevented planting premium load at 0.2 percent, as it did in 1998.

The FCIC argues that the district court erred by 1) concluding that Insurer's claims in Counts II and V fell within the "indemnification" provision of § 1508(j)(3), 2) concluding that it had original jurisdiction over Insurer's § 1508(j)(3) claims, 3) concluding if it had jurisdiction, that the FCIC was wrong to set the premium load for prevented planting coverage in 1997 at 0.0 percent, and 4) awarding damages for the 1997 crop year based on the premium rates ultimately adopted for 1998.

Insurer cross appeals, claiming that the district court erred regarding Counts II and V by 1) limiting its review to the administrative record and employing an arbitrary and capricious standard of review, 2) failing to indemnify it for every dollar paid out on prevented planting claims as well as administrative and operating expense reimbursements which should have been received from the FCIC, and 3) concluding that the FCIC had not violated § 1508(j)(3) in establishing prevented planting rates for the 1996 crop year.

III.

On its appeal the FCIC argues that the district court erred in concluding that the "indemnification" provision in § 1508(j)(3) applies to the claims Insurer attempts to

-10-

raise in Counts II and V. It contends that indemnification under this statute is limited to situations in which the FCIC is required to indemnify insurers for successful claims brought against them by producers. Insurer responds that the statutory language is broad enough to permit direct claims by insurers for indemnification for any type of errors by the FCIC. We review questions of statutory interpretation de novo. <u>Wingert & Assoc., Inc. v. Paramount Apparel Int'l, Inc.</u>, 458 F.3d 740, 743 (8th Cir. 2006). The "long established plain language rule of statutory interpretation" requires "examining the text of the statute as a whole by considering its context, object, and policy." <u>Harmon Indus., Inc. v. Browner</u>, 191 F.3d 894, 899 (8th Cir. 1999) (internal citations and quotations omitted).

Section 1508(j) is titled "Claims for losses," and its provisions outline the FCIC's role in adjusting and paying producers' claims for losses and their options when a claim for loss is denied:

> (1) In general—Under rules prescribed by the [FCIC], [FCIC] may provide for adjustment and payment of claims for losses. The rules prescribed by the [FCIC] shall establish standards to ensure that all claims for losses are adjusted, to the extent practicable, in a uniform and timely manner.
>
> (2) Denial of claims
>
>> (A) In general—Subject to paragraph (B), if a claim for indemnity is denied by the [FCIC] or an approved provider, an action on the claim may be brought against the [FCIC]. . . .
>>
>> (B) Statute of limitations—A suit on the claim may be brought not later than 1 year after the date on which final notice of denial of the claim is provided to the claimant.
>
> **(3) Indemnification—The [FCIC] shall provide approved insurance providers with indemnification, including costs and reasonable attorney fees incurred by the approved insurance provider, due to errors or omissions on the part of the [FCIC].**

(Emphasis added.) According to the FCIC, a proper suit might be brought under this section by an insurer seeking indemnity from the FCIC after being sued by a producer for a mistaken statement in an agency bulletin about insurance coverage.

The parties apparently agreed with this interpretation when they amended their SRA in 1995 to include an agreement mirroring the language of § 1508(j)(3), stating that "[the FCIC] will only provide indemnification, *as authorized by the Act*, including costs and reasonable attorney fees incurred by [Insurer], that result solely from the errors or omissions on the part of [the FCIC]," and only if Insurer has notified the agency of the request and explained why indemnification would be in the best interests of the agency, retained mutually acceptable legal counsel, presented legal arguments on issues suggested by the agency, and *the agency has agreed in writing to be joined as a party*. These provisions indicate that FCIC and Insurer understood that indemnification under § 1508(j)(3) would only be available in situations in which they would be on the same side of an action brought by a third party, presumably a producer.

Other courts have concluded that when read within its context, subsection (j)(3) is limited to situations in which an insurer is sued by a producer on a claim for loss. See Williams Farms of Homestead, Inc. v. Rain & Hail Ins. Servs., Inc., 121 F.3d 630, 635 (11th Cir. 1997) (§ 1508(j)(3) "presume[s] an action against private insurance companies"); Bullard v. Southwest Crop Ins. Agency, Inc., 984 F. Supp. 531, 536 n.3 (E.D. Tex. 1997) ("§ 1508(j)(3) presumes the existence of state law claims by requiring the [FCIC] to provide indemnification to approved insurance providers").

An extensive search through the history of the Act has produced only one instance in which language like that in § 1508(j)(3) was discussed during the legislative process. Prior to enactment of the Federal Crop Insurance Reform Act of 1994 which included § 1508, the chairman of the American Association of Crop Insurers testified to a House subcommittee that amendments were needed to improve the FCIC's compliance program because its auditors at that time were pursuing loss

claims which were five to ten years old, and private insurers were receiving "almost no support from [the FCIC]" to defend against questionable or unfounded claims for losses made by producers. To address these problems he proposed several amendments, including a requirement that the FCIC provide "indemnification for errors and omissions on the part of the government." Testimony of John H. Joyce, Chairman on behalf of the American Association of Crop Insurers, Before the House Agriculture Subcommittee on Environment, Credit and Rural Development and House Agriculture Subcommittee on Specialty Crops and Natural Resources, 1994 WL 266205 (June 9, 1994). This testimony seeking changes in the statute supports the FCIC's argument that the purpose for which Congress enacted § 1508(j)(3) was to permit indemnification for insurers on claims made against them by producers arising from errors or omissions of the FCIC.

We conclude that the statutory language and context of § 1508(j)(3), the legislative history, and the parties' indemnification amendment to the 1995 SRA provide persuasive evidence that the statute's indemnification requirement was intended to apply only where an insurer has been sued by a producer to recover on a claim for loss. We conclude therefore that § 1508(j)(3) does not provide a cause of action for the claims Insurer attempted to bring in Counts II and V and that these claims should have been dismissed by the district court.[4] Because of this decision we need not reach other arguments raised by the parties.

---

[4]Even if § 1508(j)(3) were as broad as Insurer suggests, there would be an issue whether FCIC's decision to assign a 0.0 percent premium rate for prevented planting coverage for the Western region in the 1996 and 1997 crop years was an actionable "error or omission." Other provisions give the FCIC wide discretion in its ratesetting decisions. See 7 U.S.C. § 1508(k)(2) (FCIC determines whether rates are consistent with sound reinsurance principles); § 1508(a) (FCIC determines whether it has sufficient actuarial data to offer prevented planting coverage); § 1508(d)(1) (FCIC determines whether overall MPCI premiums are actuarially sufficient to attain an expected loss ratio of not greater than 1.10 across all plans of insurance). See Am. Growers Ins. Co. v. FCIC, AGBCA No. 98-200-F at 11, 24-25 (June 15, 2000).

## IV.

Accordingly, we reverse the judgment of the district court based on § 1508(j)(3) (in favor of the FCIC for crop years 1996, 1998 – 2001 and in favor of Insurer for crop year 1997) and remand Counts II and V for dismissal for failure to state a claim upon which relief can be granted.

_____