# United States Court of Appeals

### For the Eighth Circuit

_____

No. 19-1378

_____

Arkansas Times LP

*Plaintiff - Appellant*

v.

Mark Waldrip, in his official capacity as Trustee of the University of Arkansas Board of Trustees; John Goodson, in his official capacity as Trustee of the University of Arkansas Board of Trustees; Kelly Eichler, in her official capacity as Trustee of the University of Arkansas Board of Trustees; David Pryor, in his official capacity as Trustee of the University of Arkansas Board of Trustees; Stephen Broughton, in his official capacity as Trustee of the University of Arkansas Board of Trustees; C C Gibson, in his official capacity as Trustee of the University of Arkansas Board of Trustees; Tommy Boyer, in his official capacity as Trustee of the University of Arkansas Board of Trustees; Steve Cox, in his official capacity as Trustee of the University of Arkansas Board of Trustees

*Defendants - Appellees*

------------------------------

First Amendment Scholars; Council on American Islamic Relations; American Friends Service Committee; Israel Palestine Mission Network of the Presbyterian Church; A Jewish Voice for Peace Inc.; U.S. Campaign for Palestinian Rights; U.S. Palestinian Community Network; U.S. Campaign for the Academic and Cultural Boycott of Israel; Friends of Sabeel North America; Institute for Free Speech; Foundation for Individual Rights in Education; Palestine Legal; The Center for Constitutional Rights; Bahia Amawi; National Lawyers Guild; Project South; J Street; T'ruah: The Rabbinic Call for Human Rights; 15 Media Organizations; Reporters Committee for Freedom of the Press; Lawrence Glickman

*Amici on Behalf of Appellant(s)*

Michael C. Dorf; Eugene Volokh; Zachor Legal Institute; Andrew Koppelman; Shurat Hadin-Israel Law Center; American Jewish Committee; Christians United for Israel; Israeli-American Coalition for Action; The Israel Project; Agudath Israel of America; The Union of Orthodox Jewish Congregations of America; Standwithus; State of Arizona; State of Florida; State of Georgia; State of Indiana; State of Missouri; State of Ohio; State of Texas; State of Utah; State of West Virginia; The Louis D. Brandeis Center Inc.; The American Center of Law and Justice

*Amici on Behalf of Appellee(s)*
_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock
_____

Submitted: January 15, 2020
Filed: February 12, 2021
_____

Before KELLY, MELLOY, and KOBES, Circuit Judges.
_____

KELLY, Circuit Judge,

Arkansas Times LP (Arkansas Times) sued various members of the University of Arkansas Board of Trustees (UABT) in their official capacities as trustees (collectively, the Defendants) concerning Arkansas Act 710 of 2017 (the Act). Arkansas Times sought a preliminary injunction enjoining enforcement of the Act, alleging that it violates the First and Fourteenth Amendments. The Defendants, represented by the Arkansas Attorney General's Office (the State), moved to dismiss the case. The district court denied Arkansas Times's motion for a preliminary injunction and dismissed the case. Arkansas Times appeals.

# I.

In 2017, Arkansas enacted Arkansas Act 710, titled "An Act to Prohibit Public Entities from Contracting with and Investing in Companies That Boycott Israel; and for Other Purposes." The Act provides, in pertinent part:

(a) Except as provided under subsection (b) of this section, a public entity shall not:

(1) Enter into a contract with a company to acquire or dispose of services, supplies, information technology, or construction unless the contract includes a written certification[1] that the person or company is not currently engaged in, and agrees for the duration of the contract not to engage in, a boycott of Israel; or

(2) Engage in boycotts of Israel.

(b) This section does not apply to:

(1) A company that fails to meet the requirements under subdivision (a)(1) of this section but offers to provide the goods or services for at least twenty percent (20%) less than the lowest certifying business; or

(2) Contracts with a total potential value of less than one thousand dollars ($1,000).

Ark. Code Ann. § 25-1-503 (2017).

---

[1]The Act does not provide a form certification or additional guidance as to what specific language, if any, a written certification must contain. Arkansas Times was required to sign a form prepared by the Defendants titled, "RESTRICTION OF BOYCOTT OF ISRAEL CERTIFICATION." See Appendix A.

The Act defines "boycott of Israel" and outlines evidence that may be considered to determine whether a company is engaging in a boycott of Israel:

(1)(A)(I) "Boycott Israel" and "boycott of Israel" means engaging in refusals to deal, terminating business activities, or other actions that are intended to limit commercial relations with Israel, or persons or entities doing business in Israel or in Israeli-controlled territories, in a discriminatory manner.[2]

[. . .]

(B) A company's statement that it is participating in boycotts of Israel, or that it has taken the boycott action at the request, in compliance with, or in furtherance of calls for a boycott of Israel, can be considered by the Arkansas Development Finance Authority as a type of evidence, among others, that a company is participating in a boycott of Israel.

Id. § 25-1-502(1). Finally, for our present purposes, the Act includes codified legislative findings. Id. § 25-1-501.[3]

---

[2]The Act does not define the term "in a discriminatory manner."

[3]The Act enumerates the following legislative findings:

(1) Boycotts and related tactics have become tools of economic warfare that threaten the sovereignty and security of key allies and trade partners of the United States;

(2) The State of Israel is the most prominent target of such boycott activity, which began with but has not been limited to the Arab League boycott adopted in 1945, even before Israel's declaration of independence and the reestablished national state of the Jewish people;

(3) Companies that refuse to deal with United States trade partners such as Israel, or entities that do business with or in such countries, make discriminatory decisions on the basis of national origin that impair those companies' commercial soundness;

Arkansas Times operates a weekly newspaper, the Arkansas Times, as well as other publications. For many years, Arkansas Times contracted with Pulaski Technical College (Pulaski Tech), located in North Little Rock, Arkansas, to run paid advertisements for the college in Arkansas Times's publications. The college became part of the public University of Arkansas System in 2017, at which point Arkansas Times began to work with UABT, which had the authority to enter into contracts for goods or services on Pulaski Tech's behalf, to continue running paid advertisements for the college. Arkansas Times and UABT contracted to run advertisements for Pulaski Tech through September 2018.

In October 2018, as the parties were preparing to enter into a new advertising contract for Pulaski Tech, UABT asked Arkansas Times to sign a written certification

---

(4) It is the public policy of the United States, as enshrined in several federal acts, to oppose boycotts against Israel, and the United States Congress has concluded as a matter of national trade policy that cooperation with Israel materially benefits United States companies and improves American competitiveness;

(5) Israel in particular is known for its dynamic and innovative approach in many business sectors, and therefore a company's decision to discriminate against Israel, Israeli entities, or entities that do business with or in Israel, is an unsound business practice, making the company an unduly risky contracting partner or vehicle for investment; and

(6) Arkansas seeks to act to implement the United States Congress's announced policy of "examining a company's promotion or compliance with unsanctioned boycotts, divestment from, or sanctions against Israel as part of its consideration in awarding grants and contracts and supports the divestment of state assets from companies that support or promote actions to boycott, divest from, or sanction Israel."

Id. § 25-1-501.

as required under the Act. Pursuant to the certification, Arkansas Times was to "agree and certif[y] that they do not currently boycott Israel, and will not boycott Israel during any time in which they are entering into, or while in contract, with [Pulaski Tech]." See Appendix A. Arkansas Times refused to sign, and as a result the parties did not renew their advertising contract. Arkansas Times then brought the present suit seeking injunctive and declaratory relief, on the grounds that the Act violates the First and Fourteenth Amendments. The district court denied Arkansas Times's motion for a preliminary injunction and granted the Defendants' motion to dismiss. The district court concluded that a boycott of Israel, as defined by the Act, is "neither speech nor inherently expressive conduct" and is thus not entitled to First Amendment protection. Arkansas Times appealed.

## II.

We review de novo the district court's decision to grant a motion to dismiss, considering as true all facts alleged in the complaint and drawing all reasonable inferences in favor of the plaintiff. Higgins Elec., Inc. v. O'Fallon Fire Prot. Dist., 813 F.3d 1124, 1129 (8th Cir. 2016). We review the denial of a preliminary injunction for an abuse of discretion.[4] Wilson v. City of Bel-Nor, 924 F.3d 995, 999 (8th Cir. 2019).

---

[4]To resolve a motion for preliminary injunction, the district court must consider (1) the threat of irreparable harm to the movant, (2) the balance between the harm and the injury that granting the injunction would inflict on other interested parties, (3) the probability that the movant will succeed on the merits, and (4) whether the injunction is in the public interest. Johnson v. Minneapolis Park & Recreation Bd., 729 F.3d 1094, 1098 (8th Cir. 2013) (citing Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc)). Regarding the third factor, a movant challenging a state statute must show it is "likely to prevail on the merits." Id. (quoting Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 731–33 & n.4 (8th Cir. 2008) (en banc)).

A.

The First Amendment, made applicable to the states by the Fourteenth Amendment, prohibits the government from "abridging the freedom of speech." U.S. Const. amend. I; see Gitlow v. New York, 268 U.S. 652, 666 (1925) (noting "freedom of speech . . . [is] among the fundamental personal rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from impairment by the States"). Under the unconstitutional conditions doctrine, "the Government may not deny a benefit to a person on a basis that infringes his constitutionally protected freedom of speech even if he has no entitlement to that benefit." Bd. of Cnty. Comm'rs, Wabaunsee Cnty. v. Umbehr, 518 U.S. 668, 681 (1996) (cleaned up) (quoting Perry v. Sindermann, 408 U.S. 593, 597 (1972)). The doctrine "[r]ecogniz[es] that constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental efforts that fall short of a direct prohibition against the exercise of First Amendment rights." Id. As a result, the government cannot, through funding conditions, indirectly impair the freedom of speech "which if directly attempted would be unconstitutional." Speiser v. Randall, 357 U.S. 513, 518 (1958); see Rumsfeld v. Forum for Acad. & Institutional Rights, Inc. (FAIR), 547 U.S. 47, 59–60 (2006).

Arkansas Times argues[5] that the Act imposes an unconstitutional condition "by prohibiting government contractors from participating in politically-motivated consumer boycotts [of Israel]." The State does not contest that the Act imposes a condition on Arkansas Times as a government contractor. See Umbehr, 518 U.S. at 677 (applying unconstitutional conditions doctrine to independent government contractors who derive a financial benefit from contracting with the government). But it argues that the condition is permissible because boycotts of Israel, as defined

---

[5]Given our ruling, we do not address Arkansas Times's other arguments on appeal.

by the Act, are not "inherently expressive" conduct subject to First Amendment protection.

In its challenge to the Act, Arkansas Times relies heavily on the Supreme Court's ruling in N.A.A.C.P. v. Claiborne Hardware Co., 458 U.S. 886 (1982). In that case, the Court considered a boycott by Black citizens of White merchants in two Mississippi counties. Id. at 888. Boycott participants purchased goods and services exclusively from Black-owned stores but also used speeches, nonviolent picketing, and pamphleting to put economic pressure on White-owned businesses. Id. at 900–01, 907–09. The boycott's "acknowledged purpose was to secure compliance by both civic and business leaders with a lengthy list of demands for equality and racial justice," in part by causing "the [boycotted] merchants [to] sustain economic injury as a result of their campaign." Id. at 907, 914. Several of the merchants filed suit to recover losses caused by the boycott and to enjoin future boycott activity. Id. at 889.

The Supreme Court rejected the merchants' claims and held, in relevant part, that the "nonviolent elements of [the boycott we]re entitled to the protection of the First Amendment." Id. at 915. These nonviolent elements included "speech, assembly, association, and petition," through which the boycotters "sought to change a social order." Id. at 911–12. The boycotters' goal was to influence governmental action, and it was foreseeable that the boycott would cause merchants economic harm. Even so, the Court held that "[t]he right of the States to regulate economic activity could not justify a complete prohibition against a nonviolent, politically motivated boycott designed to force governmental and economic change." Id. at 914; see Beverly Hills Foodland, Inc. v. United Food & Comm. Workers Union, Local 655, 39 F.3d 191, 197 (8th Cir. 1994). Arkansas Times asserts that a boycott of Israel is necessarily politically motivated and that any effort to restrict a government contractor's ability to participate in such a boycott is, as a result, an unconstitutional condition.

The State counters by citing to the Supreme Court's decision in FAIR. In FAIR, several law schools refused to allow military recruiters on campus in protest of the military's "don't ask, don't tell" policy, which excluded openly gay and lesbian persons from serving in the military. 547 U.S. at 66; see Telescope Media Grp. v. Lucero, 936 F.3d 740, 758 (8th Cir. 2019). The Court concluded that the law schools' refusal was not protected by the First Amendment because it was not inherently expressive conduct. The Court explained that "[t]he expressive component of a law school's actions is created not by the conduct but by the speech that accompanies it." FAIR, 547 U.S. at 66. Instead, the actions of the law schools would be expressive only if they combined their conduct with speech that explained it. Without the accompanying speech, no one would understand why they refused to allow military recruiters on campus.

The State says this case is indistinguishable from FAIR because a decision not to purchase Israeli goods, like the decision to bar military recruiters from campus, is "all but invisible absent explanatory speech." According to the State, "a boycott of Israel is [simply] not expressive conduct," and as such is not entitled to First Amendment protection. But the comparison is not an exact fit because FAIR did not concern a boycott. In FAIR, the Supreme Court addressed the Solomon Amendment, which gave universities "a choice: Either allow military recruiters the same access to students afforded any other recruiter or forgo certain federal funds." Id. at 58. The Court thus focused narrowly on the law schools' conduct in relation to military recruiters and never characterized it more broadly as a "boycott."[6] Here, we are faced with a statute that expressly concerns and prohibits "boycotts." See Ark. Code Ann. § 25-1-501 et seq. (the terms "boycott Israel," "boycotts of Israel," and simply "boycott").

---

[6]Indeed, the word "boycott" is never used in the opinion. See generally FAIR, 547 U.S. 47.

And the Supreme Court has reiterated since Claiborne that at least some elements of a boycott are entitled to First Amendment protection. Fed. Trade Comm'n v. Superior Ct. Trial Lawyers Ass'n, 493 U.S. 411 (1990). In Trial Lawyers, a group of Criminal Justice Act (CJA) lawyers refused to accept any further assignments to represent indigent criminal defendants until they received an increase in compensation. Id. at 426. The Federal Trade Commission (FTC) concluded that the lawyers' "coercive, concerted refusal to deal" was an illegal boycott under the antitrust laws. The FTC then entered a cease-and-desist order "to prohibit the respondents from initiating another boycott . . . whenever they become dissatisfied with the results or pace of the city's legislative process." Id. at 419–20.

In response to the CJA lawyers' argument that their conduct was constitutionally protected, the Court said it was "clear that the [lawyers'] efforts to publicize the boycott, to explain the merits of its cause, and to lobby District officials . . . were fully protected by the First Amendment." Id. at 426. The closer question was whether the FTC could prohibit their concerted refusal to accept further CJA assignments. Id. Distinguishing this boycott from the one in Claiborne, the Court held that because "the undenied objective of their boycott was an economic advantage for those who agreed to participate," the lawyers' conduct was not constitutionally protected. Id. In contrast to the politically-motivated boycott in Claiborne, through which Black Mississippians sought "equal respect and equal treatment to which they were constitutionally entitled," the CJA lawyers' "immediate objective was to increase the price that they would be paid for their services." Id. at 426–27. Thus, the Court concluded, to the extent the lawyers refused to accept case assignments until they received a raise in their hourly rate, they had engaged in an "economic boycott" that was not afforded First Amendment protection. Id. (citing Claiborne, 548 U.S. at 914–15).

With this background, we understand that at least some—but not necessarily all—elements of a boycott are protected by the First Amendment. Thus, we must

determine what the Act prohibits. Does it prohibit solely commercial activity that lacks any expressive or political value? Or does it also prohibit those elements of a boycott, such as speech and association, that we know enjoy First Amendment protection? We must answer these questions before we can determine whether the Act imposes an unconstitutional condition on companies seeking to contract with the State of Arkansas. We turn, then, to the Act itself.

B.

We review questions of statutory interpretation de novo, Am. Growers Ins. Co. v. Fed. Crop Ins. Corp., 532 F.3d 797, 803 (8th Cir. 2008), and we are bound by a state's rules of statutory interpretation when reviewing a statute of that state. See, e.g., Roubideaux v. N.D. Dep't of Corr. & Rehab., 570 F.3d 966, 972 (8th Cir. 2009) (applying North Dakota statutory interpretation principles to North Dakota law). Under Arkansas law, "[t]he basic rule of statutory construction is to give effect to the intent of the legislature." Simpson v. Cavalry SPV I, LLC, 440 S.W.3d 335, 337 (Ark. 2014). "Where the language of a statute is plain and unambiguous, [the] court determines the legislative intent from the ordinary meaning of the language used." Id. We are to "construe[] the statute so that no word is left void, superfluous, or insignificant," giving "meaning and effect to every word in the statute, if possible." Id. at 338. "If the language of a statute is clear and unambiguous and conveys a clear and definite meaning, it is unnecessary to resort to the rules of statutory interpretation." Id.

Under Arkansas law "[a] statute is considered ambiguous if it is open to more than one construction." Id. "When a statute is ambiguous, [we] must interpret it according to legislative intent and [our] review becomes an examination of the whole act." Id. We "review[] the act in its entirety," and "will reconcile provisions to make them consistent, harmonious, and sensible in an effort to give effect to every part."

-11-

Id. When necessary, we also "must look at the legislative history, the language, and the subject matter involved." Id.

We begin with section 503(a)(1) of the Act. This section states that "a public entity shall not" enter into a contract with a company unless that company "is not currently engaged in, and agrees for the duration of the contract not to engage in, a boycott of Israel." Ark. Code Ann. § 25-1-503(a)(1). The Act then defines "boycott of Israel" to mean[7] (1) "engaging in refusals to deal"; (2) "terminating business activities"; or (3) "other actions that are intended to limit commercial relations with Israel, or persons or entities doing business in Israel or in Israeli-controlled territories," "in a discriminatory manner." Id. § 25-1-502(1)(A)(i). Neither party seriously disputes that the first two terms in the definition of a "boycott of Israel" are limited to economic or commercial activities. Assuming without deciding that the Act would not run afoul of the First Amendment if it were limited to purely economic activity, our focus is on whether the term "other actions" includes activity that is constitutionally protected.

The phrase "other actions" is not defined in the Act, but it is limited by language that follows it: other actions "that are intended to limit commercial relations with Israel, or persons or entities doing business in Israel or in Israeli-controlled territories." The State urges us to conclude that the phrase "other actions" is limited to commercial conduct, which it asserts is non-expressive and not protected by the First Amendment. But the State's narrow reading of the definition of "boycott of Israel" is not the only reasonable interpretation. Actions "intended to limit commercial relations with Israel" could encompass a much broader array of conduct than only commercial conduct, at least some of which would be protected by the First Amendment. We are not convinced, from a plain reading of the text, that the Act necessarily allows a company to post anti-Israel signs, donate to causes that promote

---

[7]"Boycott Israel" has the same definition under the Act as "boycott of Israel."

a boycott of Israel, encourage others to boycott Israel, or even publicly criticize the Act. If a company took any of these actions with the intent to "limit commercial relations with Israel" as a general matter, that conduct would arguably fall within the prohibition.

Because the definition of "boycott Israel" is open to more than one plausible construction, it is ambiguous. To resolve this ambiguity, we consider the entire Act and use appropriate tools of statutory construction to interpret the statute consistent with its legislative intent. See Simpson, 440 S.W.3d at 338; Curtis Lumber Co. v. La. Pac. Corp., 618 F.3d 762, 776 (8th Cir. 2010). We recognize that the district court employed *ejusdem generis*, a canon of construction that counsels "when general words follow specific words in a statutory enumeration the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding words," to understand the meaning of the phrase "other actions." Hanley v. Ark. State Claims Comm'n, 970 S.W.2d 198, 201 (Ark. 1998). Applied to the Act, this canon suggests that the term "other actions" should be read narrowly to include only conduct similar in kind to the terms that precede it: "refusals to deal" and "terminating business activities." Under this reading, "other actions" would refer only to commercial activity (or inactivity) akin to not economically engaging with Israel. Notably, the State has not provided any example of the type of conduct that, under their interpretation of the Act, would fall in the "other actions" category.

But we must look to the Act as a whole to resolve the ambiguity in its meaning.[8] See Simpson, 440 S.W.3d at 338 (explaining that, under Arkansas law, we

---

[8]The dissent suggests that we "retreat[] from [a] straight-forward analysis" by using additional tools of statutory interpretation rather than relying on *ejusdem generis* alone. But as noted above, Arkansas law requires us to review the whole Act to resolve statutory ambiguity, giving "meaning and effect to every word in the statute," and we decline to restrict our analysis when multiple tools of statutory interpretation aid our understanding. Indeed, Arkansas law counsels that canons of

-13-

look to the statute as a whole to interpret it according to the legislative intent).  When we do, we see that it permits the State to consider specified "type[s] of evidence" to determine whether "a company is participating in a boycott of Israel."  This evidence includes the company's own "statement that it is participating in boycotts of Israel."  Additionally, evidence that a government contractor "has taken the boycott action"[9] in association with others (*i.e.*, "at the request, in compliance with, or in furtherance of calls for a boycott of Israel") can be considered to enforce the Act.  At a minimum, therefore, a company's speech and association with others may be considered to determine whether the company is participating in a "boycott of Israel," and the State may refuse to enter into a contract with the company on that basis, thereby limiting what a company may say or do in support of such a boycott.[10]  In this way, the Act implicates the First Amendment rights of speech, assembly, association, and petition recognized to be constitutionally protected boycott activity.  See Claiborne, 458 U.S. at 911–12; Jordahl v. Brnovich, 336 F. Supp. 3d 1016, 1041–43 (D. Ariz. 2018), *vacated as moot*, 789 F. App'x 589 (9th Cir. 2020); Koontz v. Watson, 283 F. Supp. 3d 1007, 1021–22 (D. Kan. 2018).

That the term "other actions" captures constitutionally protected activity is further supported by the Act's codified legislative findings.  Cf. Ark. Charcoal Co. v. Ark. Pub. Serv. Comm'n, 773 S.W.2d 427, 429 (Ark. 1989) (relying on statute's general legislative findings to determine the General Assembly's intent and purposes

---

construction like *ejusdem generis* "are only aids to judicial interpretation, and they will not be applied when there is no ambiguity, *to defeat legislative intent and purpose*, to make general words meaningless, or *to reach a conclusion inconsistent with other rules of construction*."  Seiz Co. v. Ark. State Highway & Transp. Dep't, 324 S.W.3d 336, 342 (Ark. 2009) (second emphasis added).

[9]The Act does not define "boycott action."

[10]In contrast, "[t]he Solomon Amendment neither limits what law schools may say nor requires them to say anything."  FAIR, 547 U.S. at 60.

-14-

for enacting it); <u>Manning v. State</u>, 956 S.W.2d 184, 186 (Ark. 1997) (same). Those findings state that Arkansas seeks to implement the policy of "examining a company's *promotion* or compliance with unsanctioned boycotts, divestment from, or sanctions against Israel as part of its consideration in awarding grants and contracts." Ark. Code Ann. § 25-1-501(6) (emphasis added). The findings further state that Arkansas "supports the divestment of state assets from companies that *support or promote* actions to boycott, divest from, or sanction Israel." <u>Id.</u> (emphasis added). Thus, Arkansas seeks not only to avoid contracting with companies that refuse to do business with Israel. It also seeks to avoid contracting with anyone who supports or promotes such activity.[11]

---

[11]We also note that the Act uses the singular word "boycott" throughout the legislative findings. While "boycott of Israel" and "boycott Israel" are defined in the Act, the word "boycott" is not. <u>Compare</u> <u>id.</u> § 25-1-501(1) ("[b]oycotts and related tactics"), <u>id.</u> § 25-1-501(2) ("boycott activity"), <u>id.</u> § 25-1-501(6) ("unsanctioned boycotts"), <u>with</u> <u>id.</u> § 25-1-502(1)(a)(i) (defining "boycott Israel" and "boycott of Israel"). Under Arkansas law, "[i]n the absence of a statutory definition for a term, we resort to the plain meaning of a term." <u>State v. Jernigan</u>, 385 S.W.3d 776, 781 (Ark. 2011). According to dictionaries from the time the Act was enacted, the plain meaning of "boycott" involves an inherent element of expression. <u>See, e.g.</u>, *Boycott*, Oxford English Dictionary (3d ed. 2008) ("To withdraw from commercial or social interaction with (a group, nation, person, etc.) as a protest or punishment; to refuse to handle or buy (goods), or refuse to participate in (an event, meeting, etc.), as a protest."); *Boycott*, Merriam-Webster Dictionary (11th ed. 2003) ("to engage in a concerted refusal to have dealings with (a person, a store, an organization, etc.) usually to express disapproval or to force acceptance of certain conditions"); *Boycott*, Cambridge Advanced Learner's Dictionary (4th ed. 2013) ("to refuse to buy a product or take part in an activity as a way of expressing strong disapproval"); *Boycott*, American Heritage Dictionary (5th ed. 2011) ("To abstain from or act together in abstaining from using, buying, dealing with, or participating in as an expression of protest or disfavor or as a means of coercion."). These definitions guide our reading of the legislative findings and suggest that the Act's intent was to restrict economic refusals to deal as well as a government contractor's ability to support or promote boycotts of Israel through its speech.

-15-

Finally, the facts of this case do nothing to detract from our reading of the term "other actions." The Act does not include a form certification, see supra note 1, so the Defendants drafted their own certification for Arkansas Times to sign. See Appendix A. According to the only certification form in the record, a contractor must agree and certify that it will not engage in a "boycott of Israel" for the duration of the contract. Yet the certification makes no effort to provide the Act's definition of "boycott of Israel," leaving it to the contractor to determine what activity is prohibited. Relying on the ordinary meaning of "boycott," see supra note 11, a contractor could readily conclude that it was prohibited from both refusing to economically engage with Israel *and* supporting or promoting a boycott of Israel or Israeli-goods. A contractor that does not want to risk violating the terms of its contract would likely refrain even from activity that is constitutionally protected.

Considering the Act as a whole, we conclude that the term "other actions" in the definition of "boycott Israel" and "boycott of Israel" encompasses more than "commercial conduct" similar to refusing to deal or terminating business activities. Instead, the Act requires government contractors, as a condition of contracting with Arkansas, not to engage in economic refusals to deal with Israel *and* to limit their support and promotion of boycotts of Israel.[12] As such, the Act restricts government

---

[12]The district court relied upon the doctrine of constitutional avoidance to conclude that "other actions" referred to purely commercial conduct. Constitutional avoidance is the "bedrock principle" that "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [the court] is to adopt the latter" out of respect for the legislature, assumed to legislate "in the light of constitutional limitations." Union Pac. R.R. Co. v. U.S. Dep't of Homeland Sec., 738 F.3d 885, 892–93 (8th Cir. 2013). But "the canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as a means of choosing between them." Saxton v. Fed. Housing Finance Agency, 901 F.3d 954, 959 (8th Cir. 2018) (quoting Clark v. Martinez, 543 U.S. 371, 381 (2005)). When

-16-

contractors' ability to participate in speech and other protected, boycott-associated activities recognized by the Supreme Court in Claiborne.  See 458 U.S. at 915.  Therefore, the Act imposes a condition on government contractors that implicates their First Amendment rights.

C.

Determining that the Act's condition for contracting with Arkansas implicates the First Amendment does not end our analysis because not all such conditions are unconstitutional.  See e.g., Rust v. Sullivan, 500 U.S. 173, 198 (1991).  A funding condition unconstitutionally burdens First Amendment rights where it "seek[s] to leverage funding to regulate speech outside the contours of the program itself."  Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc. (AOSI), 570 U.S. 205, 214 (2013); see FCC v. League of Women Voters of Cal., 468 U.S. 364, 399–401 (1984).  In response, the State asserts that because "boycotting Israel is not protected by the First Amendment," the certification is simply a truthful statement that "provide[s] the government with information."  But this generalization is inconsistent with both the

---

considering the whole Act, as Arkansas law requires, there is but one permissible interpretation—that the Act restricts speech in addition to economic refusals to deal with Israel.

To the extent the dissent suggests that the constitutional avoidance principle requires us to adopt the State's interpretation of the Act, we respectfully disagree.  Although we begin by presuming a challenged statute is constitutional, we assess whether that statute truly is so by employing principles of statutory interpretation and "all other interpretative guides [to] give effect to the intent of the legislature."  Booker v. State, 984 S.W.2d 16, 21 (Ark. 1998); see also Ark. Hearing Instrument Dispenser Bd. v. Vance, 197 S.W.3d 495, 499 (Ark. 2004) ("If we can construe a statute as constitutional, we will do so provided that such a construction does not contravene the intent of the legislature.").  Having done this, we reach the conclusion that the Act implicates the First Amendment rights of would-be government contractors.

law and the text of the Act. Supporting or promoting boycotts of Israel *is* constitutionally protected under <u>Claiborne</u>, yet the Act requires government contractors to abstain from such constitutionally protected activity. Without any explanation of how this condition seeks to "define the limits of [the State's] spending program," it can be viewed only as seeking to "leverage funding to regulate speech outside the contours of the program itself." <u>AOSI</u>, 570 U.S. at 214–15. Thus, the Act prohibits the contractor from engaging in boycott activity outside the scope of the contractual relationship "on its own time and dime." <u>Id.</u> at 218. Such a restriction violates the First Amendment.

Accordingly, we reverse and remand for further proceedings consistent with this opinion.

KOBES, Circuit Judge, dissenting.

Arkansas prohibits public entities from contracting with companies that boycott Israel by (1) "engaging in refusals to deal"; (2) "terminating business activities"; or (3) taking "other actions that are intended to limit commercial relations with Israel, or persons or entities doing business in Israel or in Israeli-controlled territories," "in a discriminatory manner." Ark. Code Ann. §§ 25-1-503(a)(1), 25-1-502(1)(A)(I). The majority finds that "other actions" broadly bans constitutionally protected activities. I respectfully disagree. The provision is a catch-all for commercial activities that do not fit the first two categories, but have the same purpose—to reduce the company's business interactions with Israel in a discriminatory way. I think that is clear. To the extent it is ambiguous, I would apply a constitutionally-permissible interpretation and uphold the statute.

Under the canon of *ejusdem generis*, "when general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific

-18-

words." *Edwards v. Campbell*, 370 S.W.3d 250, 253 (Ark. 2010). The principle squarely applies here. The specific phrases before the "other actions" provision—"engaging in refusals to deal" and "terminating business activities"—relate solely to commercial activities. It follows that the more general phrase, "other actions," does too.

The majority retreats from this straight-forward analysis because "the State has not provided any example of the type of conduct that, under [its] interpretation of the Act, would fall in the 'other actions' category." Maj. Op. 13. But consider the following: a company begins charging overly-inflated shipping prices for products shipped to Israel to reduce commercial relationships with the country. While this is not a refusal to deal or a termination of business activities, it is another "action . . . intended to limit commercial relations with Israel." Ark. Code Ann. § 25-1-502(1)(A)(I).

By not applying *ejusdem generis,* the court is left with an unnecessarily ambiguous clause and so turns to the entire Act, which it claims yields "but one permissible interpretation." Maj. Op. 16, n.2. Each argument in support of this "one permissible interpretation" is unpersuasive.[13]

The majority first argues that the statute regulates speech because it allows speech in support of boycotts and association with boycotters to be used as evidence of participation in prohibited boycotts. But "[t]he First Amendment . . . does not prohibit the evidentiary use of speech . . . to prove motive or intent." *Wisconsin v.*

---

[13]The majority criticizes use of *ejusdem generis* because the doctrine cannot be used to defeat ordinary tools of statutory construction. But its tools are (1) considering the types of evidence permitted to prove intent; (2) reading a policy statement overbroadly and inconsistently with other statements of legislative purpose; and (3) saying that the executive's enforcement of the statute makes it difficult for people to know what conduct is proscribed. I do not view any of these as ordinary tools of statutory construction.

-19-

*Mitchell*, 508 U.S. 476, 489 (1993). Here, a company only engages in a boycott of Israel if its "other actions are *intended* to limit commercial relations with Israel, or persons or entities doing business in Israel or in Israeli-controlled territories." Ark. Code Ann. § 25-1-502(1)(A)(I) (emphasis added). The better (and constitutionally permissible) understanding of the permitted use of speech here is that it may establish the element of intent. The prohibited *conduct* is still commercial.

Next, the court says that the Act's legislative findings show that "other actions" encompasses protected activity. To get there, the majority says that by stating a broader policy and desire to limit the State's commercial interactions with those who, among other things, support or promote actions to boycott Israel, the Arkansas Legislature must have taken unconstitutional steps to accomplish these goals. But states have a broad mandate to enact legislation evincing the policy choices of their citizens. We may only hold states back in achieving those goals when they do so by unconstitutional means. Nothing in the text of the operative provision itself suggests overreach (regulation of protected speech) by the Arkansas Legislature, and we should not impute an unconstitutional meaning to a statute that is benign on its face.

This interpretation of the Act's purpose is also inconsistent when considered with the other legislative findings. The findings express concern for the commercial viability of companies that refuse to do business with Israel and the commercial effect this may have on the state's finances. For example, Section 25-1-501(3) notes that companies that "make discriminatory decisions on the basis of national origin [] impair . . . [their] commercial soundness." Section 25-1-501(5) observes that companies that discriminate against businesses in Israel are "unduly risky contracting partner[s] or vehicle[s] for investment" because they do not have access to innovation coming from the country. These statements suggest a purely commercial purpose for the statute, and if we consider legislative findings in our analysis, they weigh strongly in favor of upholding the statute.

-20-

Finally, the majority argues that the facts of the present case "do nothing to detract from [its] reading of the term 'other actions.'" Maj. Op. 15. Even if this were true, the facts similarly do not support the majority's reading. The majority argues that the certification fails to notify the contractor of what conduct is prohibited. I disagree. The certification references the statute, *see* Appendix A, and anyone interested in finding out what conduct is barred can read the definition in Section 502. Even if the majority were correct, vagueness arguments like this are only colorable under the due process clauses, and Arkansas Times did not plead that claim.[14]

Even if I am wrong and the statute is susceptible to the majority's interpretation, we have two options: (1) use the entire Act to raise constitutional questions about "other actions"; or (2) read "other actions" consistent with *ejusdem generis* and uphold the statute. In Arkansas, "[t]he first and most important rule of statutory interpretation is that a statute is presumed constitutional and all doubts are resolved in favor of constitutionality." *Booker v. State*, 984 S.W.2d 16, 21 (Ark. 1998). To honor this principle, "[i]f it is possible to construe a statute as constitutional, we must do so." *Reinert v. State*, 71 S.W.3d 52, 54 (Ark. 2002); *see also McLane S., Inc. v. Davis*, 233 S.W.3d 674, 677 (Ark. 2006) ("All statutes are presumed constitutional, and if it is possible to construe a statute so as to pass constitutional muster, this court will do so."). That is plainly possible here, and I would "construe [the] statute with

---

[14]"[I]mprecise laws can be attacked on their face under two different doctrines." *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999). While a statute may be challenged on First Amendment grounds where "impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep,'" *id.* (citation omitted), the majority does not levy that attack here. Instead, its argument more closely resembles a Fifth or Fourteenth Amendment Due Process claim that the statute is "impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." *Id.*

-21-

a limiting interpretation to preserve [its] constitutionality." *Arkansas Hearing Instrument Dispenser Bd. v. Vance*, 197 S.W.3d 495, 499 (Ark. 2004).[15]

The court's effort to stretch the term "other actions" is unavailing. The easiest and most natural reading of the statute is constrained: "other actions" is similar to the purely commercial terms preceding and modifying it. I would interpret it accordingly and affirm the district court. I respectfully dissent.

———————————————————

---

[15]The majority's initial finding of ambiguity alone may be fatal to its argument. The majority suggests that constitutional avoidance is a canon of last resort, but that is premised on federal principles of statutory interpretation, and "we are bound by a state's rules of statutory interpretation when reviewing a statute of that state." Maj. Op. 11 (citation omitted). *Booker* suggests Arkansas prioritizes constitutional avoidance more than federal courts. 984 S.W.2d at 21. In any case, even if constitutional avoidance is a canon of last resort—it applies here.

# APPENDIX A

## RESTRICTION OF BOYCOTT OF ISRAEL CERTIFICATION

Pursuant to Arkansas Code Annotated §25-1-503, a public entity **shall not** enter into a contract valued at $1,000 or greater with a company unless the contract includes a written certification that the person or company is not currently engaged in, and agrees for the duration of the contract not to engage in, a boycott of Israel.

By signing below, the Contractor agrees and certifies that they do not currently boycott Israel, and will not boycott Israel during any time in which they are entering into, or while in contract, with the University of Arkansas - Pulaski Technical College. If at any time after signing this certification the contractor decides to engage in a boycott of Israel, they must notify the University of Arkansas – Pulaski Technical College in writing.

If the Contractor currently boycotts Israel, or engages in the boycott of Israel while in contract with the University of Arkansas – Pulaski Technical College, see Arkansas Code Annotated §25-1-503.

| | |
|---|---|
| Description of product or service | |
| Contractor name | |

Contractor Signature: _____     Date: _____
Signature must be hand written, in ink



-23-